<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

JOSEPH C. KUPFER,

     Defendant - Appellant.

No. 13-2189

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:10-CR-03383-WJ-1)**

_____

O. Dean Sanderford, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with him on the briefs) Office of the Federal Public Defender, Denver, Colorado, for Defendant-Appellant.

Jeremy Pena, Assistant United States Attorney (Damon P. Martinez, United States Attorney, with him on the brief) Office of the United States Attorney, Albuquerque, New Mexico, for Plaintiff-Appellee.

_____

Before **BRISCOE**, Chief Judge, **BALDOCK**, and **BACHARACH**, Circuit Judges.

_____

**BACHARACH**, Circuit Judge.

_____

According to the government, Mr. Joseph Kupfer and his wife conspired to enable Dr. Armando Gutierrez (a media consultant) to increase his compensation under a State contract without any additional work. In exchange for the increase, Dr. Gutierrez allegedly gave kickbacks to Mr. Kupfer through Mr. Kupfer's consulting company. The government alleged that Dr. Gutierrez had disguised the kickbacks as payments for Mr. Kupfer's work on a separate media campaign involving voter awareness.

The government successfully prosecuted Mr. Kupfer in two trials. In the first, the jury found Mr. Kupfer and his wife guilty of tax evasion. In the second, the jury found Mr. Kupfer guilty of stealing and participating in a conspiracy to steal federal government property with a co-defendant, Dr. Gutierrez. The district court entered a judgment of conviction for these crimes and sentenced Mr. Kupfer to ten years in prison. Mr. Kupfer appeals the conviction and sentence on all counts.

On appeal, we affirm the conviction and reverse and remand to the district court for resentencing.

## I.     Issues Involving the Conviction

We start with Mr. Kupfer's challenges to the conviction.

## A.    Tax Evasion Trial

Mr. Kupfer and his wife jointly filed federal income taxes from 2004 to 2006, but failed to report over $790,000 in gross income. The government charged Mr. Kupfer with three counts of tax evasion and aiding and abetting, one count for each year. *See* 26 U.S.C. § 7201; 18 U.S.C. § 2. Mr. Kupfer admitted that he had failed to report a substantial amount of gross income, but denied that his under-reporting was willful. The jury disagreed and found Mr. Kupfer guilty on each count. On appeal, he challenges the adequacy of the jury instructions and the district court's response to an allegation of jury misconduct.[1] On both issues, we conclude that the district court acted within its discretion.

### 1.    Jury Instructions

The district court instructed the jury that it could find guilt only if Mr. Kupfer's under-reporting of income had been willful. According to Mr. Kupfer, the court should have gone further, instructing the jury that the under-reporting would not have been considered "willful" if it had been merely negligent, inadvertent, accidental, mistaken, or reckless. We rejected this contention in

---

[1]    Ms. Elizabeth Kupfer filed her own appeal in the tax evasion case, and Mr. Kupfer joins in her arguments. *See* Fed. R. App. P. 28(i). We more fully addressed the issues on the tax counts in *United States v. Kupfer* (Elizabeth), No. 13-2138, __ F.3d __, 2015 WL 4081108, at *1-3 (10th Cir. July 7, 2015).

deciding Ms. Kupfer's appeal. *United States v. Kupfer* (Elizabeth), No. 13-2138, __ F.3d __, 2015 WL 4081108, at *1–3 (10th Cir. July 7, 2015). Based on our opinion in that appeal, we conclude that the district court acted within its discretion in declining to include Mr. Kupfer's proposed language.

## 2.    Juror Misconduct

After the trial ended, Ms. Kupfer submitted an affidavit from a juror stating that a fellow juror had commented about other charges during jury deliberations. Based on this affidavit, Mr. Kupfer requested a new trial on the ground of juror misconduct. The district court declined to conduct a hearing or grant a mistrial. We conclude that these rulings fell within the district court's discretion because the court could reasonably determine on the record it had that (1) a hearing was unnecessary and (2) the improper remarks were harmless.

When a defendant presents credible evidence of prejudicial information during jury deliberations, a presumption of prejudice arises and the trial court must investigate. *United States v. Davis*, 60 F.3d 1479, 1484–85 (10th Cir. 1995). To carry out that duty, trial courts must ordinarily hold a hearing; but in rare exceptions, the court need not hold a hearing if it would not be useful. *United States v. McVeigh*, 153 F.3d 1166, 1186 (10th Cir. 1998).

As explained in our opinion addressing Ms. Kupfer's appeal, the district court acted within its discretion in declining to conduct a hearing and in denying the motion for a mistrial. *United States v. Kupfer* (Elizabeth), No. 13-2138, __ F.3d __, 2015 WL 4081108, at *3–6 (10th Cir. July 7, 2015).

**B.** **Conspiracy Trial**

The conspiracy trial involved allegations of overpayment to Mr. Kupfer, ostensibly based on his subcontract to help on a media campaign. This media campaign grew out of a federal grant to the State of New Mexico to increase voter awareness. With this grant, the State paid millions to a consultant (Dr. Gutierrez), who in turn paid over $740,000 to Mr. Kupfer.

Dr. Gutierrez also had two other State contracts. One involved an anti-smoking campaign; the other involved an elder-abuse campaign.

No misconduct is alleged with the elder-abuse campaign. But the government argued at trial that Mr. Kupfer had influenced the State to amend the contract for the anti-smoking campaign, allowing Dr. Gutierrez to obtain more than $950,000 in extra compensation.

According to the government, Mr. Kupfer earned only a small fraction of the $950,000+. The remainder, according to the government, was a kickback to Mr. Kupfer for his role in getting

Dr. Gutierrez the increased compensation on his anti-smoking contract.

Invoking this theory, the government charged Mr. Kupfer with one count of conspiracy and three counts of stealing federal money or assisting another in stealing federal money. The jury found Mr. Kupfer guilty on all counts, and he argues that the district court erred by admitting evidence of the anti-smoking and elder-abuse contracts.

**1.    Evidence Involving the Anti-Smoking Contract**

At trial, the government presented evidence of Mr. Kupfer's role in a contract between the New Mexico Attorney General's Office and Dr. Gutierrez. This contract called for Dr. Gutierrez to produce commercials on smoking prevention and cessation.

Mr. Kupfer moved to preclude evidence of this contract, arguing that (1) the evidence was not relevant and (2) it constituted inadmissible evidence of uncharged misconduct under Federal Rule of Evidence 404(b). The court overruled the objection, holding that (1) the evidence was probative as intrinsic evidence and (2) the probative value was not substantially outweighed by the danger of

unfair prejudice.[2] We conclude that the district court acted within its discretion in admitting the evidence.

### a. Intrinsic Evidence

Mr. Kupfer challenges the characterization of the anti-smoking contract as intrinsic evidence. We reject that challenge. The district court acted within its discretion in concluding that the evidence was inextricably intertwined with the charged conduct.

When we apply Rule 404(b), we distinguish between evidence that is extrinsic or intrinsic to the charged crime. *United States v. Pace*, 981 F.2d 1123, 1135 (10th Cir. 1992), *abrogated on other grounds as recognized in United States v. Bell*, 154 F.3d 1205, 1209–10 (10th Cir. 1998). Evidence of other acts may be inadmissible under Federal Rule of Evidence 404(b), but this rule does not cover evidence that is considered "intrinsic." *United States v. Irving*, 665 F.3d 1184, 1212 (10th Cir. 2011).

Evidence is considered

- "intrinsic" when it is "directly connected to the factual circumstances of the crime and provides contextual or background information to the jury," and

- "extrinsic" when it "is extraneous and is not intimately connected or blended with the factual circumstances of the charged offense."

---

[2] In the alterative, the district court held that the evidence would be admissible as extrinsic evidence. We need not address the alternative rationale.

*United States v. Parker*, 553 F.3d 1309, 1314 (10th Cir. 2009)

(quoting Thomas M. DiBiagio, *Intrinsic and Extrinsic Evidence in Federal Criminal Trials: Is the Admission of Collateral Other-Crimes Evidence Disconnected to the Fundamental Right to a Fair Trial*, 47 Syracuse L. Rev. 1229, 1231 (1997)).

We regard evidence as intrinsic when it

- was "inextricably intertwined" with the charged conduct,[3]

- occurred within the same time frame as the activity in the conspiracy being charged,[4]

- was a necessary preliminary to the charged conspiracy,[5]

- provided direct proof of the defendant's involvement with the charged crimes,[6]

- was "entirely germane background information, . . . 'directly connected to the factual circumstances of the crime,'"[7] or

---

[3]    *United States v. Lambert*, 995 F.2d 1006, 1007 (10th Cir. 1993) (quoting *United States v. Williams*, 900 F.2d 823, 825 (5th Cir. 1990)).

[4]    *See United States v. Parker*, 553 F.3d 1309, 1315 (10th Cir. 2009) ("The three transactions within the charged conspiracy time-frame are intrinsic to the crime and substantiate the criminal conspiracy.").

[5]    *Lambert*, 995 F.2d at 1007.

[6]    *Parker*, 553 F.3d at 1314–15.

[7]    *United States v. Irving*, 665 F.3d 1184, 1212–13 (10th Cir. 2011) (quoting *Parker*, 553 F.3d at 1314).

-8-

- was necessary to provide the jury with background and context of the nature of the defendant's relationship to his accomplice.[8]

The district court could reasonably conclude that evidence of the anti-smoking contract had satisfied these criteria: Dr. Gutierrez's payments to Mr. Kupfer and the anti-smoking contract amendments occurred together within a short time-period and tended to show the conspiracy being charged and Mr. Kupfer's involvement. *See United States v. Parker*, 553 F.3d 1309, 1315 (10th Cir. 2009).

The district court regarded the anti-smoking contract as intrinsic because it (1) was intertwined with payments Dr. Gutierrez had made to Mr. Kupfer and (2) showed Elizabeth Kupfer's involvement in issuing payments. R., vol. VIII, at 3081–82. The district court based its ruling on the government's theory of the intertwined relationship between the federal grant and the anti-smoking contract amendments, which is reflected by the timing of the payments to Mr. Kupfer.

Within five months of receiving a $250,000 increase in the anti-smoking contract, Dr. Gutierrez paid $140,000 to Mr. Kupfer's consulting company even though it had not yet begun work on the project. *Id.* at 1866–67, 2620–21. The court could wonder why Dr.

---

[8] *United States v. Hall*, 508 F. App'x 776, 779–80 (10th Cir. 2013) (unpublished).

Gutierrez was willing to pay Mr. Kupfer's consulting company in advance. *See id.* at 1808 (discussing the facts that "the contract became effective 9-9-04, and that invoice [for $2 million] came in the day after").

Then, within thirteen months of the largest price increase under the anti-smoking contract ($350,000), Dr. Gutierrez made three more monthly payments (totaling $200,000) to Mr. Kupfer's consulting company.

Based on this timing, the jury could infer a connection between (1) Dr. Gutierrez's price increases under the anti-smoking contract and (2) his payments to Mr. Kupfer under the voter-awareness contract.

Mr. Kupfer argues that the voter-awareness and anti-smoking contracts were distinct because the contracts involved different agencies, only one of the contracts involved federal funds, and the anti-smoking contract preceded the voter-awareness contract by four years. It is true that the contracts were distinct. But the government theorized that Dr. Gutierrez had used money from the voter-awareness contract to pay Mr. Kupfer for increasing the payments under the anti-smoking contract. Under this theory, both contracts (the voter-awareness and the anti-smoking contracts) were integral to

-10-

the scheme. The differences between the contracts did not invalidate the government's theory.

According to Mr. Kupfer, the government changed its theory at trial, characterizing the payments to Mr. Kupfer as kickbacks on the voter-awareness contract (rather than for the price increases on the anti-smoking contract). This argument reflects Mr. Kupfer's confusion over the government's theory.

The government never accused Mr. Kupfer of doing something illegal to get Dr. Gutierrez the voter-awareness contract; the government's theory—before, during, and after the trial—was that Mr. Kupfer and his wife had worked to land Dr. Gutierrez over $950,000 in additional payments under the anti-smoking contract.

Under the government's theory, Dr. Gutierrez had to pay Mr. Kupfer to secure the extra payments. Mr. Kupfer had no responsibilities under the anti-smoking contract, but he had a subcontract to help Dr. Gutierrez with the voter-awareness contract. That subcontract involved Mr. Kupfer's production-related work on a short training video. For that work, Dr. Gutierrez paid Mr. Kupfer over $740,000. The government attributed those payments to kickbacks for the anti-smoking contract's price increases. The kickbacks, however, were disguised as payments for Mr. Kupfer's work on the voter-awareness contract.



Mr. Kupfer contends that the government dropped this theory at trial, but the government never wavered from this theory. At trial, for example, the government explained its conspiracy allegation in opening statements:

> And you may ask why during the course of this trial, why the Defendant Gutierrez would pay $750,000 to Defendant Joseph Kupfer. The evidence, as I previously mentioned, is going to show that there were favors back and forth between these two men over the course of the years, political allies, friends. But $750,000? Here's what you're also going to learn, that in addition to the [voter-awareness] contract that the defendant had with the Secretary of State's office during this time frame, he also

had contracts with the Attorney General's office where Elizabeth Kupfer was the chief financial officer. And these were lucrative contracts, you will learn.

R., vol. VIII, at 1383–84. The government then discussed the amendments to Dr. Gutierrez's anti-smoking contract, which increased his pay from $150,000 to over $1,100,000. *Id.* at 1384. The government repeated this theory in closing argument. *Id.* at 2931–33. In our view, the government's theory has been consistent throughout the proceedings.

In these circumstances, the district court had the discretion to treat the evidence as intrinsic.

### b. Unfair Prejudice

Mr. Kupfer also contends that the district court erred in applying Federal Rule of Evidence 403. Under this rule, the district court can exclude evidence if the probative value is substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403. The district court concluded that the danger of unfair prejudice did not require exclusion.

In reviewing this conclusion, we apply the abuse-of-discretion standard. *United States v. Archuleta*, 737 F.3d 1287, 1292 (10th Cir. 2013). Under this standard, the ruling was permissible.

The court could reasonably view the evidence as highly probative. Mr. Kupfer acknowledges that the anti-smoking contract

-13-

was "highly suspicious" because it "ballooned Gutierrez's pay by over $800,000." Appellant's Opening Br. at 31.

**The Increases in Dr. Gutierrez's Anti-Smoking Contract**



The biggest jumps occurred in May 2004 and December 2004, with amendments that increased Dr. Gutierrez's compensation by $250,000 and then $350,000. Between these two huge jumps, Dr. Gutierrez paid Mr. Kupfer's company $140,000, before Mr. Kupfer had done any work on the anti-smoking campaign.

And within thirteen months of obtaining the unexplained increase of $350,000 under the anti-smoking contract, Dr. Gutierrez paid Mr. Kupfer's company another $200,000. Mr. Kupfer ultimately

collected a total of $746,375 for work on the voter-awareness contract.

But even after being subpoenaed, Dr. Gutierrez never furnished a contract between himself and Mr. Kupfer (or Mr. Kupfer's consulting company) and took two years to furnish invoices that had been subpoenaed. And in the invoices eventually furnished, Mr. Kupfer had provided only vague descriptions of his work (without any itemization).

In these circumstances, the district court could view the $746,375 in payments to Mr. Kupfer's company as compensation for the extraordinary increases in Dr. Gutierrez's anti-smoking contract. As a result, the court could reasonably view evidence of the anti-smoking contract as highly probative.

Under Rule 403, the court could still exclude the evidence if the probative value was substantially outweighed by the danger of unfair prejudice. But the court could reasonably view any prejudice as fair, rather than unfair.

In urging unfair prejudice, Mr. Kupfer denies involvement in the numerous increases in Dr. Gutierrez's anti-smoking contract. Mr. Kupfer says it was his wife, not himself, with the connections and position to engineer these price increases. According to Mr. Kupfer, the evidence was unfairly prejudicial because the jury could

impermissibly find him guilty by association because of his wife's conduct, without finding any wrongdoing on the part of Mr. Kupfer.

But the district court could view the situation differently. There was evidence that both Kupfers (not just Ms. Kupfer) had strong ties to the Secretary of State. And sandwiched between two extraordinary compensation increases for Dr. Gutierrez were equally generous, unexplained payments from Dr. Gutierrez to the company owned by Mr. Kupfer, not his wife. In these circumstances, the district court could reasonably conclude that Mr. Kupfer was being held accountable for his own role—not his wife's—in the huge increases paid to Dr. Gutierrez under the anti-smoking contract.[9] Thus, the district court did not abuse its discretion in applying Rule 403.

## 2. Elder-Abuse Contract

The district court allowed the government to use evidence of a contract between Dr. Gutierrez and the Attorney General's office to create media materials raising awareness of elder abuse, dubbing the

---

[9]     Mr. Kupfer relies on *United States v. Cardall*, 885 F.2d 656, 671 (10th Cir. 1989). *Cardall* does not support Mr. Kupfer's argument. There we explained that the government must give a precise reason for introduction of evidence requiring a prior bad act, and the reason must involve the defendant's participation in the bad act. 885 F.2d at 671.

Here, the government provided the precise reason for introduction of the evidence; that reason involved Mr. Kupfer's own "bad act," a scheme to obtain kickbacks for inflating Dr. Gutierrez's payments from the State.

contract the "Elder-Abuse Contract." The government alleged no wrongdoing with respect to that contract, offering it only as an example of a legitimate baseline to compare the cost of the anti-smoking campaign. Mr. Kupfer argues the district court erred in allowing use of the elder-abuse contract because there was no link between him and the evidence. We need not reach this argument for two reasons:

1. The elder-abuse contract could have been admissible as probative evidence unrelated to character.

2. Any error in admitting the evidence would have been harmless.

### a.     The Admissibility of the Elder-Abuse Contract

Under Federal Rule of Evidence 402, all relevant evidence is admissible unless otherwise stated by federal law or rule. Rule 404(b) provides an example of a rule stating otherwise, for this rule precludes evidence of other acts. *United States v. Commanche*, 577 F.3d 1261, 1267 (10th Cir. 2009). But this rule precludes the use of evidence only when it is offered to attack a witness's character. Fed. R. Evid. 404(b); *see United States v. Kendall*, 766 F.2d 1426, 1436 n.5 (10th Cir. 1985) ("To fall within the scope of 404(b), an act need not be criminal, so long as it tends to impugn a defendant's character.").

The evidence of an elder-abuse contract is not subject to Rule 404(b) because it does not concern character. The government offered the evidence only to illustrate a legitimate contract between Dr. Gutierrez and the New Mexico Attorney General's Office. Under the contract, Dr. Gutierrez received $63,418.92 (for which there was no allegation of wrongdoing). R., vol. VIII, at 1861–62. By comparison, Dr. Gutierrez received over $1.1 million for similar work under the suspect anti-smoking contract. *Id.* at 1867.

Once the anti-smoking contract was admitted, the elder-abuse contract became relevant to show Dr. Gutierrez's normal billing rate for a legitimate media contract. Because there was no suggestion of wrongdoing in connection with the elder-abuse contract, there was no danger involving use of the contract as character evidence.

Minimal danger arose from this benign evidence and it had probative value; thus, the evidence was relevant and was not subject to exclusion under Rule 403 or Rule 404(b).

### b. Harmless Error

Even if the district court had erred in admitting the elder-abuse contract evidence, it would have been harmless.

We will not reverse a defendant's conviction on the basis of a district court's erroneous admission of evidence if the error was

harmless to the defendant. *United States v. Blechman*, 657 F.3d 1052, 1067 (10th Cir. 2011).

Under this standard, we ask if the error had a "substantial influence" on the trial's outcome or generates "'grave doubt' as to whether it had such effect." *United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990) (en banc) (quoting *Kotteakos v. United States*, 328 U.S. 750, 756 (1946)). To make this assessment, we review the entire record de novo, "examining the context, timing, and use of the erroneously admitted evidence at trial and how it compares to properly admitted evidence." *United States v. Hanzlicek*, 187 F.3d 1228, 1237 (10th Cir. 1999).

The government showed that any error would have been harmless, for the elder-abuse contract had played only a minor role in the trial. On that contract, the government asked one witness five general questions. R., vol. VIII, at 1861–62. These questions pertained only to the amount of the fees ($63,418.92) and identification of Ms. Kupfer as the person overseeing the contract. *Id.* In these questions and answers, there was no suggestion of wrongdoing with respect to that contract. *Id.* And in closing argument, the prosecutor never even mentioned the elder-abuse contract. In these circumstances, we conclude that the evidence regarding the elder-abuse contract did not substantially influence the

-19-

trial or generate grave doubt about the outcome. Accordingly, any error would have been harmless.

## II. Issues Involving Procedural Reasonableness of the Sentence

After entering a judgment of conviction, the district court sentenced Mr. Kupfer for all offenses. In deciding on the sentence, the court calculated the guideline range. According to Mr. Kupfer, the calculations were incorrect because the court had (1) selected the wrong guideline for the offense, and (2) improperly enhanced the sentence based on obstruction of justice. We agree with both of Mr. Kupfer's arguments.

### A. Applicable Offense Guideline

When calculating the appropriate guideline, the district court started by evaluating the trial evidence. R., vol. VIII, at 3253–61. Mr. Kupfer argues this approach constituted error because the court should have considered only the offense of conviction as charged and presented to the jury. We agree.

In reviewing the district court's selection of the applicable offense guideline, we engage in de novo review. *See United States v. Neilson*, 721 F.3d 1185, 1187 (10th Cir. 2013).[10] Applying de novo

---

[10] The government argues that the clear-error standard applies because the selection of the offense guideline turns on factual findings. As discussed below, we disagree. The district court

-20-

review, we conclude that the district court incorrectly chose the offense guideline.

To determine the offense guideline in this case, the court had to engage in a three-step process[11]:

1. identifying the charge from the indictment and jury instructions,

2. finding the substantive offense in the guidelines' statutory index, and

3. finding the applicable guideline range.

*See* U.S. Sentencing Guidelines Manual § 1B1.2 (U.S. Sentencing Comm'n 2012) (explaining the process for determining the applicable guideline).

The district court should have begun by identifying the charge as one involving conspiracy to steal funds. In the superseding indictment, Mr. Kupfer was charged with two types of conspiracy under 18 U.S.C. § 371: (1) to steal federal money in violation of 18 U.S.C. § 641, and (2) to defraud the federal government. R., vol. I, at 11–20 (Count 1). But the court instructed the jury only on the first

mistakenly relied on trial evidence to select the offense guideline. As we explain, selection of the offense guideline entails a three-step process involving legal determinations rather than factual findings.

[11] We do not necessarily prescribe this three-step process in every case. In our case, however, these three steps are necessary for the court to identify the offense guideline based on the indictment and jury instructions.

-21-

type of conspiracy: to steal federal money in violation of 18 U.S.C. § 641. The jury was never instructed on the government's fraud theory. Thus, we know that Mr. Kupfer was ultimately convicted under 18 U.S.C. § 641 for conspiracy to steal federal money.

When assessing a conspiracy conviction, the sentencing guidelines instruct courts to choose the guideline provision that best fits the substantive offense underlying the conspiracy or use the general conspiracy guideline. U.S. Sentencing Guidelines Manual §§ 1B1.2, 2X1.1 (U.S. Sentencing Comm'n 2012). Here, the substantive offense involves a violation of 18 U.S.C. § 641. Thus, we turn to the statutory index to determine the guideline provision for § 641.

In the guidelines' statutory index, § 641 is paired with two possible guidelines: (1) § 2B1.5 and (2) § 2B1.1.

The first possibility (§ 2B1.5) involves stealing or damaging cultural heritage and paleontological resources. U.S. Sentencing Guidelines Manual § 2B1.5 (U.S. Sentencing Comm'n 2012). That provision is obviously inapplicable to our facts.

The second option (§ 2B1.1) is a general provision covering theft, which fits the conspiracy to steal federal money. Thus, § 2B1.1 provides the applicable offense guideline.

-22-

The government disagrees, arguing that the applicable offense guideline is § 2C1.1. To get to § 2C1.1, the government points out that the conspiracy was charged under 18 U.S.C. § 371. Section 371 appears in the statutory index and is paired with multiple guidelines. Two of these are § 2X1.1 and § 2C1.1. *See* U.S. Sentencing Guidelines Manual app. A, at 537 (U.S. Sentencing Comm'n 2012). The government insists that of these guidelines, § 2C1.1 presents the closest fit.[12]

When more than one guideline section is listed, the statutory index instructs the court to "use the guideline most appropriate for the offense conduct charged in the count of which the defendant was convicted." *Id.*, app. A, at 532. When the conviction involves a conspiracy, the court must "refer to § 2X1.1 (Attempt, Solicitation, or Conspiracy) as well as the guideline referenced in the Statutory Index for the substantive offense." *Id.* § 1B1.2(a). Section 2X1.1 is a general catch-all provision that instructs courts to apply a more specific guideline section when a conspiracy is expressly covered by that section. *Id.* § 2X1.1(c)(1).

According to the government, the conspiracy is expressly covered by § 2C1.1. We disagree.

---

[12]    The government acknowledges that the other possible guideline provisions listed in the statutory index (under 18 U.S.C. § 371) do not apply. *See* Appellee's Br. at 32.

-23-

To determine whether § 2C1.1 applies, we must determine how we go about selecting the applicable guideline section. Mr. Kupfer argues that we simply compare

- the charge in the indictment that resulted in the conviction and

- the corresponding provision in the guidelines' statutory index.

The government argues that we should also consider the facts elicited at the trial about the nature of the charged conspiracy. In our view, however, that argument is foreclosed by a 2000 amendment to the sentencing guidelines (Amendment 591).

Prior to this amendment, the application notes suggested that the court could often select the offense of conviction based on the offender's actual conduct. U.S. Sentencing Guidelines Manual § 1B1.2 App. Note 3 (U.S. Sentencing Comm'n 1999). In Amendment 591, the Sentencing Commission deleted the application note to clarify that the defendant's actual conduct bears on "relevant conduct," which comes into play only after the court selects the offense of conviction. U.S. Sentencing Guidelines Manual, App. C (U.S. Sentencing Comm'n Supp. 2000); *see United States v. Moreno*, 421 F.3d 1217, 1219 (11th Cir. 2005) (per curiam) ("Amendment 591 requires that the initial selection of the offense guideline be

based only on the statute or offense of conviction rather than on judicial findings of actual conduct not made by the jury.").

The district court used the pre-2000 method when selecting the offense of conviction. Instead of focusing solely on the charged offense, as Amendment 591 requires, the district court relied on the trial evidence to identify the offense of conviction. In relying on the trial evidence, the court found that (1) the evidence had shown that the conspiracy involved fraud against the federal government and (2) the conspiracy included participation by New Mexico's Secretary of State, an elected official. Based on these findings, the court characterized the conspiracy as one involving fraud and participation by a public official. With this characterization, the court concluded that the offense of conviction triggered § 2C1.1.

Mr. Kupfer argues the court erred by considering these facts when selecting the applicable provision. We agree.

Under Amendment 591, a district court may consider other relevant conduct later in the guideline calculation process, but not when selecting the offense of conviction. *See United States v. Boney*, 769 F.3d 153, 161–62 (3d Cir. 2014) ("[T]he Guidelines Manual makes clear that the sentencing court must select the 'most appropriate' guideline based on the offense charged in the indictment, not the court's perception of the facts of the case

-25-

presented at trial."), *cert. denied*, __ U.S. __, 135 S. Ct. 1003 (2015); *United States v. Almeida*, 710 F.3d 437, 441 (1st Cir. 2013) ("[W]hen selecting the 'most appropriate' guideline, the sentencing court should look to the conduct alleged in the indictment, and not to uncharged conduct described in trial testimony."); *United States v. Aquino*, 555 F.3d 124, 129 (3d Cir. 2009) ("[W]e may consider only offense of conviction conduct, not all relevant conduct, at Step One."); *see also* Thomas W. Hutchison, et al., *Fed. Sent. L. & Prac.* § 1B1.3, Authors' comment 2 (2015 ed.) (stating that the offense guideline is based on the offense of conviction, not relevant conduct).

The district court determined that § 2C1.1 was appropriate only by examining the trial evidence in addition to the indictment and jury instructions. At trial, the government theorized that Mr. Kupfer and Dr. Gutierrez had conspired with the New Mexico Secretary of State. Because the Secretary of State was a public official, the court thought § 2C1.1 would apply. But Mr. Kupfer would have been guilty even if the Secretary of State had been blameless. *See United States v. Huizar-Velazquez*, 720 F.3d 1189, 1192 (9th Cir. 2013) (holding that § 2C1.1 did not provide the correct guideline because the crime

involved a scheme to trick the government out of its money rather than to corrupt government officials).[13]

Because § 2C1.1 does not expressly cover the offense as charged, § 2X1.1 would apply if we were to focus on the conspiracy charge under 18 U.S.C. § 371. Because § 2X1.1 is a general conspiracy guideline, the court calculates the base offense level by referring to the guideline for the underlying substantive offense that was the object of the conspiracy. U.S. Sentencing Guidelines Manual § 2X1.1(a) (U.S. Sentencing Comm'n 2012). As discussed above, § 2B1.1 appears in the statutory index and fits the substantive offense that was the objective of the conspiracy (violation of 18

---

[13]    Mr. Kupfer relies on *United States v. Neilson*, 721 F.3d 1185 (10th Cir. 2013). This reliance is misguided. As Mr. Kupfer points out, the *Neilson* panel did choose the offense guideline based in part on the defendant's actual conduct. *Neilson*, 721 F.3d at 1188-89. But there the defendant pleaded guilty and admitted his conduct in connection with his guilty plea. *Id.* at 1186-87.

Even after adoption of Amendment 591, the guidelines have provided a narrow exception to the general rule that requires selection of the offense of conviction based on the offense that was charged in the indictment and that was the basis for the finding of guilt. U.S. Sentencing Guidelines Manual § 1B1.2(a) (U.S. Sentencing Comm'n 2012). This exception involves guilty pleas. When a defendant pleads guilty and stipulates to a "more serious offense than the offense of conviction," the court must use the offense guideline applicable to the stipulated offense. *Id.*

This exception was applied in *Neilson* because there the defendant pleaded guilty. *Neilson*, 721 F.3d at 1186-87. Mr. Kupfer did not plead guilty, and this exception does not apply here.

-27-

U.S.C. § 641). *See id.*, app. A., at 539. Thus, if we were to focus on the charge under 18 U.S.C. § 371, we would still need to apply § 2B1.1 for the offense guideline.



When we apply § 2B1.1, we obtain a guideline range of 78–97 months. *See* R., vol. VIII, at 3254 (the district court's acknowledgment that the base-offense level would have been 28 under § 2X1.1). The district court mistakenly used § 2C1.1 as the offense of conviction, which led to a guideline range of 121–151 months. *See id.* at 3258 (concluding that the base-offense level was 32 based on § 2C1.1). That error requires reversal.

**B.    Obstruction of Justice Enhancement**

The district court made a second sentencing error, this one on the calculation of the total offense level for the tax evasion counts. In reaching that guideline, the court used an enhanced guideline on the ground that Mr. Kupfer had obstructed justice by failing to reveal his under-reporting of income.

The parties agree that this enhancement constituted error. We too agree, for we have held that enhancement for obstruction of justice is improper based on a defendant's failure to disclose his own crime. *See United States v. Kupfer (Elizabeth),* __ F.3d __, 2015 WL 4081108, at *6 (10th Cir. July 7, 2015) (discussing the issue in connection with the obstruction of justice enhancement for Ms. Kupfer's tax-evasion case). The parties also agree that this error became prejudicial once we concluded that Mr. Kupfer's total offense level should have been 28 rather than 32. Oral Arg. at 18:57–19:49.[14] Thus, the enhancement for obstruction of justice constitutes reversible error.

---

[14]    The prejudice arises because of the corresponding adjustment to the offense guideline under the grouping rules. *See* U.S. Sentencing Guidelines Manual §§ 3D1.1–3D1.5 (U.S. Sentencing Comm'n 2012).

**III. Conclusion**

We affirm the conviction. But we reverse and remand on the sentence with instructions to the district court to vacate the sentence and resentence Mr. Kupfer by (1) identifying the offense level under § 2B1.1 rather than § 2C1.1, and (2) removing the enhancement for obstruction of justice.