**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 26, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ROY LEE ROBERTS, JR.,

    Defendant - Appellant.

No. 23-7037
(D.C. No. 6:21-CR-00180-DCJ-1)
(E.D. Okla.)

_____

**ORDER AND JUDGMENT\***
_____

Before **PHILLIPS**, **KELLY**, and **FEDERICO**, Circuit Judges.
_____

In November 2022, Roy Lee Roberts, Jr. was convicted by a jury of three crimes: two counts of Aggravated Sexual Abuse in Indian Country (Counts 1 and 2) and one count of Sexual Abuse of a Minor in Indian Country (Count 4). As a result, the district court sentenced him to life imprisonment on Counts 1 and 2 and 180 months on Count 4, with the sentences to run concurrently. On direct appeal, Roberts raises four trial

---

\* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

errors that he says warrant a new trial. Two purported errors relate to alleged "character evidence" — bad character evidence about him and good character evidence about a government witness — which he argues was improperly admitted into evidence and prejudiced him. A third error raised is that the prosecution made improper remarks during closing argument by misstating the testimony of both minor victims. Finally, Roberts argues the cumulative error doctrine requires that he be granted a new trial.

We have jurisdiction under 28 U.S.C. § 1291. Having considered the record and arguments in full, we discern no error and affirm the judgment.

**I**

In May 2021, a grand jury returned an indictment charging Roberts with three counts of Aggravated Sexual Abuse in Indian Country in violation of 18 U.S.C. §§ 2241(c), 2246(2)(B), 1151, and 1153. In January 2022, a grand jury returned a superseding indictment, which realleged the three counts and added a fourth count of Sexual Abuse of a Minor in Indian Country in violation of 18 U.S.C. §§ 2243(a), 2246(2)(B), 1151, and 1153. The initial indictment named R.R. as the victim for Counts One, Two, and Three, and the superseding indictment named C.R. as the victim for Count Four. R.R. and C.R. are Roberts' biological sons.

In November 2022, a two-day jury trial occurred, and five witnesses were called by the prosecution: Roberts' two victims, his cousin, a forensic interviewer, and an expert on child sexual abuse.

One of Roberts' victims, R.R., testified first. At the time of the trial, R.R. was ten years old. Notably, he changed his name because he did not want to be named after his father. R.R. testified that one summer night in 2017, while at Roberts' home, he awoke needing a glass of water. He then went into the living room and saw Roberts, Brittany Roberts,[1] and C.R. with their clothes "halfway" on. R.IV at 64. Roberts told R.R. to go back to bed and they never discussed what had happened.

Brittany died in December 2017, after which R.R. lived at his grandfather's house with his siblings and Roberts for a couple of weeks. R.R. testified that one night, Roberts woke him up while they were sleeping in the same bed and sexually abused him. R.R. said that this abuse occurred

---

[1] Brittany, Roberts' late wife, was the biological mother of R.R. and A.R., but not of C.R. A.R. is also Roberts' biological son. Roberts was not charged with any offenses against A.R.

Brittany died in a motor vehicle accident in December 2017 when Roberts, driving intoxicated, crashed with her in the passenger seat. Roberts was convicted of manslaughter as a result, but the jury in this case did not hear any details of this.

after Brittany died but before Melanie Henry, Roberts' cousin, took custody of him.

Henry testified after R.R. and began by stating that she has been a first-grade teacher in Wister, Oklahoma, for 22 years. Her husband, Jason Henry, is also a teacher and he coaches basketball in Cameron, Oklahoma. Henry testified that she and her husband have no biological children together and that, in June 2020, they formally adopted R.R. and A.R.

Henry described R.R. as "a basketball star" who is "gifted and talented." *Id.* at 112. She also described him as "very, very smart," and "very Christian," and that he wants to do "big things in life." *Id.* As for activities, Henry testified that she and the children go to basketball games and the movie theatre, as well as go horseback riding and ride four-wheelers. She also testified that they go to church "two or three times a week." *Id.* at 114.

About her relationship with Roberts, Henry testified that although she is his cousin, she and Roberts did not "hang out" while growing up. *Id.* at 114–15. Moreover, she and Roberts did not have each other's phone numbers and did not spend time together as adults, seeing each other roughly twice per year. When the prosecution asked Henry when R.R. and A.R. moved out of Roberts' home, Henry responded that the children moved out in December 2017, after the death of their mother.

4

Henry testified that R.R. and A.R. came to live with her on February 25, 2019. A "common cousin" of Roberts and Henry had called Henry and asked her to take in the children. *Id.* at 120–21. Henry then called Roberts and they had two conversations before she picked up R.R. and A.R. Both the conversations and the pick-up occurred on the same day. The prosecution asked, "Where were you able to pick the boys up?" *Id.* at 122. Henry answered, "We met on the side of I-40 in Okemah, Oklahoma." *Id.* The prosecution asked, "Just on the side of the road?" *Id.* She responded, "Uh-huh." *Id.*

When asked why Roberts gave her the children, she testified that "[h]e was trying to get a job at the time" and "get on his feet," by getting a house. *Id.* Henry stated that Roberts was never able to get back on his feet and that, except for five days, R.R. and A.R. have lived with her since she took them in.

Henry next testified that the Department of Human Services for Oklahoma ("DHS") routinely visited R.R. and A.R. to ensure their wellbeing, and that in October 2019, DHS came to the children's school. On this occasion, DHS asked to interview R.R. and A.R. regarding potential sexual abuse perpetrated by Roberts. *Id.* at 123–25. Henry was not aware of any abuse prior to this. After the interview, R.R. said to Henry that he did not want anybody to know about the abuse or look at him differently because of

it, and Henry reassured him she would not. When asked whether she ever induced R.R. to make allegations of abuse, Henry responded, "No." *Id.* at 130–31.

On cross-examination, Henry testified that she had offered to take in R.R. and A.R. prior to February 2019, but that Roberts declined her offer. On redirect-examination, Henry testified that she took R.R. and A.R. into her home because her "cousin needed help," and she "hate[s] for any child to go through what they" went through "and not have anybody there for them." *Id.* at 150. The prosecution then asked whether she provided them a stable home, food, and a roof and she responded affirmatively.

C.R., who was 18 years old at the time of the trial, testified after Henry. C.R. testified that Brittany and Roberts sexually abused him on a bed in their living room and that this abuse occurred before Brittany died in December 2017 but after his thirteenth birthday in June 2017. On cross-examination, he testified that the abuse occurred "within three months before [Brittany's] passing," or "between June and December 2017." *Id.* at 175. Apart from this, C.R. testified that he gave a forensic interview about the abuse for the first time in November 2019, the month after DHS visited R.R. and A.R. at school. He also testified to taking hallucinogenic drugs in 2019, and as a result of taking the drugs, C.R. was treated at a mental health facility for roughly one month.

After C.R., Tracy Van Kooten, a forensic interviewer, testified. She testified that she interviewed R.R. in October 2019. In this interview, R.R. disclosed that Roberts had sexually abused him.

After Van Kooten testified, Andrea Hamilton provided expert testimony regarding child sexual abuse. She testified that it is common for children to not initially disclose abuse for a variety of reasons but to do so later when they are ready to talk about it. Hamilton also testified about the differences between "delayed," "immediate," "partial," and "full" disclosure. *Id.* at 222–23. She explained that delayed and partial disclosure typically occur when the perpetrator is someone the victim knows. Hamilton also testified that it becomes "particularly difficult" when the perpetrator is a caregiver to the victim. *Id.* at 225. Furthermore, she testified that male victims tend to delay disclosure, and that this is particularly true when the perpetrator is also male. Aside from this, Hamilton testified that child victims may not remember exact details.

At the close of its case-in-chief, the prosecution moved to dismiss Count Three and the district court granted this motion. Roberts rested his case without calling any witnesses or presenting any evidence.

During the prosecution's closing argument, it discussed the timeline of abuse. The prosecution noted that "[b]oth children were unable" to specify when the abuse occurred. *Id.* at 277. However, it further noted that it was

7

not required to prove specific dates, and that the abuse occurred between June 8, 2016, and December 9, 2017, since Brittany died on December 9, and C.R.'s birthday is on June 8. As for R.R., the prosecution pointed out that the timeline of abuse was narrowed by Henry's testimony about the February 2019 transfer of custody, since the original timeline was between November 19, 2017, and September 4, 2019.

The jury trial lasted two days, and after less than a day of deliberation, the jury returned verdicts of guilty as to Counts One, Two, and Four. In June 2023, the district court imposed a life sentence for Counts One and Two, and a 180-month sentence for Count Four, all sentences to run concurrently. Roberts timely appeals.

## II

Roberts raises three arguments on appeal regarding testimony presented and statements made by the prosecution at trial, along with an argument on cumulative error. He concedes, however, that he did not object at trial to the testimony he now claims was error on appeal. As such, we may reverse only for plain error. *United States v. Battles*, 745 F.3d 436, 452 (10th Cir. 2014). To show plain error, Roberts must establish "(1) an error (2) that is plain," "(3) that affects substantial rights," and (4) that "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 445 n.9 (quoting *United States v. Goode*, 483 F.3d 676, 681 (10th Cir.

8

2007)). This standard is "difficult to overcome." *United States v. McGlothin*, 705 F.3d 1254, 1257 (10th Cir. 2013) (quoting *United States v. Frost*, 684 F.3d 963, 971–72 (10th Cir. 2012)).

"An error is plain if it is clear or obvious under current, well-settled law. In general, for an error to be contrary to well-settled law, either the Supreme Court or this court must have addressed the issue." *United States v. DeChristopher*, 695 F.3d 1082, 1091 (10th Cir. 2012) (quoting *United States v. Thornburgh*, 645 F.3d 1197, 1208 (10th Cir. 2011)). For an error to impact substantial rights, it "must have affected the outcome of the district court proceedings." *McGlothin*, 705 F.3d at 1261 n.11 (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)). The burden is on Roberts to show "a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." *United States v. Fields*, 516 F.3d 923, 944 (10th Cir. 2008) (quoting *United States v. Gonzales-Huerta*, 403 F.3d 727, 733 (10th Cir. 2005)).

### III

Roberts argues the district court plainly erred by permitting the prosecution to (1) discuss his bad character through Henry, (2) discuss Henry's good character, and (3) misstate the victims' testimony in closing argument. Taken together, Roberts also argues these plain errors amount to cumulative error, warranting a new trial.

9

## A

We first address Roberts' character evidence arguments. It is well-established that character evidence is inadmissible to prove that on a particular occasion, a person "acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1). Likewise, evidence of a "crime, wrong, or act" is inadmissible "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." *Id.* at 404(b)(1). Such evidence, however, may be admissible "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* at 404(b)(2).

If the prosecution intends to use evidence of a "crime, wrong, or act" during a criminal trial, *id.* at 404(b)(1), then reasonable notice must be provided ahead of time, "so that the defendant has a fair opportunity to meet it," *id.* at 404(b)(3)(A). The prosecution must (1) "articulate in the notice the permitted purpose for which [it] intends to offer [such] evidence and the reasoning that supports the purpose" and (2) "do so in writing before trial." *Id.* at 404(b)(3)(B)–(C). It may also comply with this requirement during trial "in any form . . . if the court, for good cause, excuses lack of pretrial notice." *Id.* at 404(b)(3)(C).

Notably, Rule 404(b) does not apply when the evidence at issue is "inextricably intertwined" or "intrinsic" to the crime charged. *United States v. O'Brien*, 131 F.3d 1428, 1432 (10th Cir. 1997) (quoting *United States v. Lambert*, 995 F.2d 1006, 1007 (10th Cir. 1993)). The Rule "only applies to evidence of acts *extrinsic* to the charged crime." *United States v. Irving*, 665 F.3d 1184, 1212 (10th Cir. 2011) (emphasis added) (quoting *United States v. Pace*, 981 F.2d 1123, 1135 (10th Cir. 1992)). To be clear, extrinsic evidence is "extraneous" and "not intimately connected or blended with the factual circumstances of the charged offense," while intrinsic evidence is "directly connected to the factual circumstances of the crime and provides contextual or background information to the jury." *United States v. Kupfer*, 797 F.3d 1233, 1238 (10th Cir. 2015) (quoting *United States v. Parker*, 553 F.3d 1309, 1314 (10th Cir. 2009)).

As an example, we regard evidence as intrinsic in the context of a conspiracy when it (1) "was inextricably intertwined with the charged conduct," (2) "occurred within the same time frame as the activity in the conspiracy being charged," (3) "was a necessary preliminary to the charged conspiracy," (4) "provided direct proof of the defendant's involvement with the charged crimes," (5) "was entirely germane background information[] directly connected to the factual circumstances of the crime," or (6) "was necessary to provide the jury with background and context of the nature of

11

the defendant's relationship to his accomplice." *United States v. Cushing*, 10 F.4th 1055, 1075–76 (10th Cir. 2021) (citing *Kupfer*, 797 F.3d at 1238).

1

Roberts first argues Henry's testimony about the transfer of custody of R.R. and A.R. on the side of the road was bad "character evidence" and extrinsic evidence of a "crime, wrong, or act," as prohibited by Rule 404. *See* Fed. R. Evid. 404(b)(1). And he argues the admission of this testimony was plain error because the prosecution failed to provide notice as required under Rule 404(b), and because the testimony was irrelevant other than to prove he was a bad father and person, so it unfairly prejudiced him.

The argument centers upon the following exchange, which took place between the prosecution and Henry:

Q:    Where were you able to pick the boys up?

A:    We met on the side of I-40 in Okemah, Oklahoma.

Q:    Just on the side of the road?

A:    Uh-huh.

R.IV at 122. The prosecution referred to this exchange in both its initial and rebuttal closing arguments. In its initial closing argument, it pointed out that Henry "went to pick them up in the middle of Okemah, Oklahoma, so they wouldn't have to sleep in the car another night." *Id.* at 284. And in its rebuttal closing argument, the prosecution referred twice to the pick-up,

12

noting that Henry "[got] a call and where [did] she go? She [went] to the side of I-40 to pick the[] [boys] up on the side of the road." *Id.* at 298.

To begin, Roberts mischaracterizes Henry's testimony as extrinsic evidence because it was inextricably intertwined to the charges.[2] First, it established a timeline of the abuse. R.R. testified that Roberts abused him after his mother died, but before Henry took custody of him. Henry's testimony thus clarified the charged crimes. And second, Henry's testimony helped explain R.R.'s delayed disclosure of the abuse — a point of contention between the parties. Hamilton, a child sexual abuse expert, testified that delayed disclosure can occur when the victim resides with the perpetrator, and even more so when the perpetrator is a caregiver. So, even if such

---

[2] At oral argument, Roberts contended that the *Cushing* factors weigh in favor of finding the testimony to be extrinsic, as opposed to intrinsic. *Cushing*, 10 F.4th at 1075–76. Specifically, he argued that (1) the testimony was not inextricably intertwined with the charged conduct, (2) did not occur within the same time frame as the charged conduct, and (3) was not a necessary preliminary to the charged conduct.

Failing to raise *Cushing* in his Opening Brief, Roberts also argues in his Reply Brief that the testimony was not "direct proof," as it was not a confession or eyewitness testimony and noted that no accomplice was involved in this case. Reply Br. at 7.

But as we discuss, the testimony at issue was not character or extrinsic evidence; it was instead intrinsic to the charged crimes. Roberts fails to rebut the Government's argument that the testimony established a timeline of abuse and explained R.R.'s delayed disclosure of the abuse. Indeed, the testimony was germane, brief, and fairly benign.

testimony were evidence of a "crime, wrong, or act," it was intrinsic evidence, not subject to the requirements of Rule 404(b). *See* Fed. R. Evid. 404(b)(1).

Furthermore, contrary to Roberts' interpretation of Henry's testimony, it was not character evidence. Henry's testimony was innocuous, and indeed, Roberts' decision to transfer custody of his children could be interpreted favorably, as one could infer he was ensuring a good home for his children during a time he was trying to better himself. It is also worth noting that the parties stipulated to the exclusion of actual bad character evidence — Roberts' causing of Brittany's death, namely his manslaughter conviction. Because Henry's testimony was neither extrinsic nor bad character evidence, we discern no error.

**2**

Roberts next argues the prosecution plainly erred in permitting good character evidence about Henry under Rule 404(a). Specifically, he asserts that the prosecution used Henry's background as a schoolteacher to insinuate that she would not induce R.R. to make false allegations of abuse.

"It is error for the prosecution to personally vouch for the credibility of a witness." *United States v. Harlow*, 444 F.3d 1255, 1262 (10th Cir. 2006) (citing *United States v. Bowie*, 892 F.2d 1494, 1498 (10th Cir. 1990)). "Argument or evidence is impermissible vouching . . . if the jury could

14

reasonably believe that the prosecutor is indicating a personal belief in the witness' credibility, either through explicit personal assurances of the witness' veracity or by implicitly indicating that information not presented to the jury supports the witness' testimony." *Bowie*, 892 F.2d at 1498.

During its initial closing argument, the prosecution said the following about Henry:

> Melanie Henry, a school teacher of 22 years. A school teacher of 22 years who just has helped kids along the way . . . . Melanie wants to protect her new family. Protect them? She went to pick them up in the middle of Okemah, Oklahoma, so they wouldn't have to sleep in a car another night. Does that sound like Melanie is to blame?

R.IV at 284. And during its rebuttal closing argument, the prosecution noted that Henry was "a lady who spent her lifetime educating, teaching, and loving on kids in schools." *Id.* at 298.

The prosecution here did not "vouch" for Henry — it merely stated facts about her background as a schoolteacher. And the prosecution reiterated these facts only after the defense presented its theory that she induced R.R. to lie about being abused.

At oral argument, Roberts likened this situation to vouching for police officer truthfulness. While potentially a persuasive argument, it contorts what the prosecution did in this case. The prosecution did not argue that Henry told the truth. Instead, the prosecution provided reasons to credit

15

her testimony based on her background — facts and evidence Roberts did not object to. And again, it simply rebutted the defense theory that Henry induced R.R. to lie by noting her lack of motive or background to lie. Furthermore, the prosecution did not argue that *all* schoolteachers tell the truth; it asserted that the jury had reason to believe *this* schoolteacher, given the unique circumstances of this case. The statements at issue were not as broad, extensive, or inflammatory as Roberts suggests. We again discern no error.

## B

We turn now to Roberts' third argument. Roberts argues the prosecution plainly made improper remarks during its closing argument, specifically about the victims' testimony.

Roberts asserts the prosecution misstated the testimony, making it appear that R.R. corroborated C.R.'s testimony. He reiterates that the victims' testimony was as follows:

- R.R. testified that the bed was "moved [to the living room] every winter," and the family would "watch scary moves in the bed for fun." *Id.* at 88.

- C.R. testified that the abuse happened "within three months before [Brittany's] passing," but after his thirteenth birthday. *Id.* at 175. Thus, he testified that it happened "in between June and December of 2017." *Id.*

Yet during closing, Roberts points out the prosecution stated the following:

16

- "[W]hen [R.R.] talked about [the family moving the bed into the living room] he said, yeah, . . . we watch Halloween movies in there, we do Christmas in there. So we know October, November, December." *Id.* at 283.

- "Well, why [are those dates] important for corroboration? It is important for corroboration because [C.R.] specifically told you that the sexual abuse happened three months before [Brittany] died, a couple of months before [Brittany] died. That lands right in October. Corroboration." *Id.*

We are unpersuaded by Roberts' argument on this point. "The prosecutor is entitled to argue to the jury that it should draw reasonable inferences from the evidence to support the government's theory of the case." *United States v. Dazey*, 403 F.3d 1147, 1170 (10th Cir. 2005) (citing *United States v. Espinosa*, 771 F.2d 1382, 1402 (10th Cir. 1985)). Indeed, the prosecution is free "to make fair comment[s] on the evidence and . . . draw reasonable inferences therefrom." *Espinosa*, 771 F.2d at 1402 (quoting *United States v. Bennett*, 542 F.2d 63, 64 (10th Cir. 1976)).

The prosecution's suggested inference that the family watched Halloween movies when R.R. testified to watching "scary" movies was reasonable. And the prosecution's suggested inference that the abuse may have happened in October, when C.R. testified the abuse happened "within three months before [Brittany's] passing[,]" was also reasonable as Brittany died in December. While the prosecution perhaps misstated the victims'

17

testimony to a small degree, such slight misstatements were reasonable inferences. Accordingly, we discern no error.

C

Finally, we consider cumulative error. "A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Brown v. Sirmons*, 515 F.3d 1072, 1097 (10th Cir. 2008) (quoting *United States v. Toles*, 297 F.3d 959, 972 (10th Cir. 2002)).

Roberts reiterates his previous three arguments and asserts that, in the aggregate, the alleged errors "undermine[d]" his case. Aplt. Br. at 49. He argues that any two errors put together would suffice and that Henry's so-called "bad father" evidence juxtaposed with Henry's good character evidence "made for a damaging contrast" and "may have caused the jury to worry that an acquittal would disrupt R.R.'s life with [Henry]." *Id.* Roberts argues that the basic elements of a fair trial were violated because the prosecution allegedly misstated the evidence and used character evidence.

We reject Roberts' cumulative error argument. As discussed, Roberts fails to establish error, much less plain error. And as the Government notes, a mere reference to Halloween movies, a two-month timeline, and the transfer of custody were not "so prejudicial that but for their presence the

18

jury would have acquitted [Roberts]." Resp. Br. at 46. This is particularly true when considering the compelling testimony that C.R. and R.R. provided about their abuse. Because Roberts fails to establish any error on appeal, we find no cumulative error.

## IV

For the reasons stated above, we AFFIRM.

Entered for the Court


Richard E.N. Federico
Circuit Judge