**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 15, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

　　Plaintiff - Appellee,

v.

THOMAS FAIRBANKS,

　　Defendant - Appellant.

No. 24-4047
(D.C. No. 1:19-CR-00114-JNP-1)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HOLMES**, Chief Judge, **MORITZ**, and **ROSSMAN**, Circuit Judges.
_____

Defendant-Appellant Thomas Fairbanks was charged with two counts of

securities fraud in violation of 15 U.S.C. §§ 77q(a) and 77x, with each count relating

to a separate victim.  On the eve of trial, Mr. Fairbanks moved to sever the two

counts under Federal Rule of Criminal Procedure 14, arguing that joinder was

prejudicial.  The district court denied his motion, and Mr. Fairbanks defended against

both counts at a single trial.

At the close of the evidence, Mr. Fairbanks moved under Federal Rule of

Criminal Procedure 29 for a judgment of acquittal on both counts.  The district court

---

[*]　　This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and
10th Cir. R. 32.1.

reserved its ruling on Mr. Fairbanks's Rule 29 motion until after the jury had reached its verdicts. After the jury found Mr. Fairbanks guilty on both counts, the district court denied Mr. Fairbanks's Rule 29 motion.

Mr. Fairbanks now appeals, arguing that (1) the district court abused its discretion by denying his motion to sever, and (2) the district court erred in denying his Rule 29 motion because the evidence was insufficient to support his conviction on Count 2. Exercising jurisdiction under 28 U.S.C. § 1291, we **affirm**.

**I**

**A**

**1**

This case arises from an investment vehicle called "SupplyLine," which Mr. Fairbanks founded and operated. Mr. Fairbanks marketed SupplyLine as a "bucket" of pooled funds, to which investors could contribute, and from which they could draw funds, to improve and expand their businesses.

Mr. Fairbanks promoted SupplyLine as an investment opportunity to small business owners in and around Logan, Utah through seminars, promotional flyers, a website, and one-on-one conversations. Mr. Fairbanks owned several other small businesses in the Logan area, including several print shops, and he emphasized that SupplyLine was a way for small business owners to engage in "necessary collaborations," "entrepreneurial business ventures," "collaborative marketing," and "education and training"—all "while returning economic and social benefits back to the community." Suppl. R., Vol. III, at 44 (Gov't Ex. 19). Mr. Fairbanks guaranteed

2

SupplyLine investors that their investments would be collateralized, maintain liquidity, and yield a six-percent annual return. He also guaranteed that investors could reclaim their funds at any time.

Mr. Fairbanks would not reveal the names of investors in the SupplyLine "bucket" in his marketing efforts; instead, he maintained that their identities were "privileged information." *Id.*, Vol. I, at 57 (Trial Tr., dated Aug. 29, 2022). SupplyLine's website, which Mr. Fairbanks operated, stated only that its "clients include individuals, self-employed, entrepreneurs, small businesses and corporations." *Id.*, Vol. III, at 19 (Gov't Ex. 17). Mr. Fairbanks was similarly secretive about SupplyLine's investors during in-person communications. He intimated to one investor, RuthAnn Holloway, only that most of her peer-investors were "probably people you would know in the community" and hinted that at least one foreign investor also contributed to the fund. *Id.*, Vol. I, at 70. Ms. Holloway's impression was that the foreign investor "was an oil baron from somewhere like Dubai." *Id.* Although Mr. Fairbanks referred to the fund's other investors in vague terms, he made clear that *his* businesses were the foundation of the bucket of pooled funds.

Mr. Fairbanks memorialized investments in SupplyLine with written contracts. Each contract conceived of SupplyLine and its counterparty investor as a partnership called a "Collaboration." The contracts declared Mr. Fairbanks "Chief Executive Officer of the Collaboration"; made him "responsible for all operations and decisions"; granted him "full, exclusive, and complete authority and discretion in the

3

management and control" of invested funds; and stated that he would be compensated for providing these services. *Id.*, Vol. III, at 2 (Gov't Ex. 1); *accord id.* at 7 (Gov't Ex. 8).

In exchange, the SupplyLine contracts guaranteed that any capital contributions "shall be compensated at an interest rate of six percent (6%) annually." *Id.* at 1, 6. The contracts also stated that "The Collaboration shall keep adequate books and records . . . setting forth a true and accurate account of all business transactions arising out of [invested funds]." *Id.* at 3, 8. And, significantly, the contracts both contemplated an initial investment as well as additional capital contributions.

Mr. Fairbanks's marketing efforts were successful; he recruited at least three local business owners to invest in SupplyLine.

**2**

Mr. Fairbanks counted James and RuthAnn Holloway among his investors. The Holloways, friends of Mr. Fairbanks, attended several SupplyLine seminars before deciding to invest $5,500. Mr. Holloway passed away in August 2021, approximately one year before trial. But Ms. Holloway testified as a government witness.

Specifically, Ms. Holloway recounted the circumstances surrounding her $5,500 investment in SupplyLine. She testified at length about Mr. Fairbanks's efforts to recruit her and her husband as investors. She recalled obtaining and reviewing a SupplyLine marketing flyer at one of Mr. Fairbanks's seminars, and

meeting with Mr. Fairbanks on several occasions to discuss a potential SupplyLine investment. She stated that at these meetings, Mr. Fairbanks promised a six-percent return, that their investment would be backed by collateral, and that they could withdraw their investment from the bucket of pooled funds at any time. Based on Mr. Fairbanks's representations, the Holloways signed a contract to invest $5,500 in SupplyLine in July 2015.

**3**

About a year before, Byrna Dustin, another of Mr. Fairbanks's investors, executed a SupplyLine investment contract on May 29, 2014. Ms. Dustin, an elderly woman, lived alone. Her health began to deteriorate in late 2014, and she suffered a stroke in early 2015—the first of six before her death in 2021. Ms. Dustin's first stroke left her confined to a walker and significantly diminished her ability to speak. Although she remained mentally competent, she could not type or sign her own name. Ms. Dustin passed away just shy of a year before Mr. Fairbanks's trial.

Thus, Ms. Dustin could not testify at his trial. But Ms. Dustin's niece, Bobette Elam, did. Ms. Elam testified that Ms. Dustin was a small business owner: She ran an herbal supplement business out of her home. Ms. Elam and other family members regularly helped Ms. Dustin—as her health worsened—with her business, medical care, and domestic work.

In the course of assisting Ms. Dustin with her affairs, Ms. Elam observed that Mr. Fairbanks began visiting Ms. Dustin's house several months before her first stroke and continued to do so afterwards, as her condition declined. By Ms. Elam's

account, Mr. Fairbanks would visit Ms. Dustin every day, arriving at around

9:00 a.m. each morning and leaving between 4:00 p.m. and 5:00 p.m. each afternoon.

According to Ms. Elam, Mr. Fairbanks held himself out to Ms. Dustin and her

family as something of a Renaissance man: "In the beginning, [he was] a computer

expert[:] He was going to help them get their business all online, because they didn't

know anything about the Internet.  And then [he] was [] a genealogist.  And then he

was an author and going to write a book." *Id.*, Vol. I, at 166.  Mr. Fairbanks also

portrayed himself as a legal expert, though he was not an attorney—even going so far

as to draft wills for Ms. Dustin and Ms. Elam's mother.  Overall, Ms. Elam

characterized Mr. Fairbanks's relationship with Ms. Dustin as opaque and

"[i]ntimate, without being intimate." *Id.* at 167.  She recalled, "he whispered to her

all the time," and "we never really knew what was being said." *Id.*

Ms. Elam recounted that, from the period after Ms. Dustin's first stroke until

her death, Ms. Dustin's "whole family [became] quietly alienated away from her."

*Id.* at 169.  Ms. Elam became concerned about Mr. Fairbanks's relationship with her

own mother (i.e., Ms. Dustin's sister) and therefore "took over all of her finances and

her bills to make sure she was protected." *Id.* at 169.  Ms. Elam also grew concerned

about Mr. Fairbanks's relationship with Ms. Dustin.  She filed a complaint with

Adult Protective Services.  But the investigation did not produce any findings of

elder abuse.

About six months before her first stroke, Ms. Dustin executed a SupplyLine

contract with Mr. Fairbanks and made a corresponding investment of $40,000.

Ms. Dustin's contract mirrored the subsequent contract of the Holloways—that is, guaranteeing a six-percent return on Ms. Dustin's investment, and contemplating additional future investments, without the need for additional contracts.

Several months later, in December 2015, while Ms. Dustin was recovering from her first stroke, she opened a joint checking and savings account with Mr. Fairbanks. Mr. Fairbanks deposited $100 into the joint account, and Ms. Dustin deposited $185,000. Less than two weeks later, a cashier's check for $30,500 was drawn on the account, payable to "ERA Advantage Realty," a business with which Mr. Fairbanks was associated, with "Supply Line Partners" written in the memo line. Five additional cashier's checks were drawn from the joint account from September 2015 to June 2017, and all five referenced SupplyLine in the memo line. These records suggest that Ms. Dustin "invested" a total of $98,700 in SupplyLine.

**4**

Mr. Fairbanks's management of the Holloways' and Ms. Dustin's funds did not live up to the guarantees in his investment contracts. Instead, Mr. Fairbanks used the SupplyLine investments for his own purposes, failed to collateralize the investments, and never repaid the principal or guaranteed interest thereon. In fact, SupplyLine was never authorized to sell securities in the first place, nor was it a registered business. In short, SupplyLine was a fraud.

**a**

In the months following the Holloways' SupplyLine investment, they lost touch with Mr. Fairbanks. The Holloways were not initially concerned; they trusted

7

Mr. Fairbanks. But after several months, they grew worried and began trying to contact him. Their efforts were unsuccessful. The Holloways could not reach Mr. Fairbanks by phone, email, or text. Nor could they contact him in person at his businesses. The Holloways left messages at one of his print shops but were told by employees that "he had left for a few minutes, and they didn't know when he'd be back." *Id.* at 80.

The Holloways finally confronted Mr. Fairbanks at one of his print shops in March 2016, eight months after they signed their SupplyLine contract and invested $5,500. They requested the return of their investment, but Mr. Fairbanks demurred, stating that the funds "weren't readily available right then, but that he could have them within days, no less than a couple of weeks." *Id.* at 82. Three more months passed. Mr. Fairbanks "became a ghost." *Id.* at 83. The Holloways sent Mr. Fairbanks a demand letter, attempted a formal dissolution of the SupplyLine agreement, and sued Mr. Fairbanks in small claims court, but none of these efforts yielded the return of their investment.

**b**

Sometime in the summer of 2017, the Holloways drove past Mr. Fairbanks's print shop and noticed a "sheriff's sale" sign on the door. The Holloways attended the sheriff's sale, purchased several items, and, after receiving permission from the building's new tenant, took several boxes of documents that Mr. Fairbanks left behind in his former office. The documents included several SupplyLine investment contracts, including Ms. Dustin's contract. Ms. Holloway testified that, "[i]n looking

8

at the documents and realizing that there were other cases that were similar to ours, I considered [SupplyLine] fraudulent." *Id.* at 108. Accordingly, the Holloways decided to refer the matter to the Utah Division of Securities ("UDS"). An investigation followed.

A UDS investigator, Liz Blaylock, testified at trial. According to Ms. Blaylock, the UDS investigation revealed that SupplyLine was neither registered to do business in Utah nor authorized to deal in securities. UDS also found that, at the time Mr. Fairbanks solicited the Holloways' investment, he was subject to, but did not disclose, prior tax liens, judgments, and an adverse bankruptcy action. Ms. Holloway testified that had she known these facts, she would not have invested in SupplyLine.

When Mr. Fairbanks was contacted by UDS investigators, he was evasive and did not offer information to clarify salient questions of the investigation. UDS notified him of the investigation and asked him to produce SupplyLine documents, including executed contracts, investor information, marketing materials, and compensation information, but Mr. Fairbanks stated that these documents had been "destroyed." *Id.* at 209–10. In a letter to UDS, he denied offering any security through SupplyLine. *See id.*, Vol. III, at 12 (Gov't Ex. 15) ("[T]here is no offering of] any kind of a security and I do not represent anyone or [any] organization who is offering one."). And Mr. Fairbanks gave an otherwise "shifting story and explanation" regarding SupplyLine in a voluntary interview with UDS investigators. *Id.*, Vol. I, at 198.

9

In the interview, Mr. Fairbanks told investigators that SupplyLine was never operational, and that its website was merely for educational purposes, and he denied ever soliciting investments in SupplyLine. When investigators responded by presenting him with copies of the SupplyLine investment contracts between him and the Holloways and Ms. Dustin, Mr. Fairbanks changed his story, conceding that although he "probably" created the contracts, neither party had received a return "yet" because "all of the investments have been sabotaged." R., Vol. IV, at 58–59 (UDS Mem. of Interview, dated June 5, 2019). When Mr. Fairbanks was asked to provide an accounting for how, precisely, the funds invested by the Holloways and Ms. Dustin were spent, he responded that "I would love to give that to you except that now that I'm homeless, all of my records . . . all of my computers . . . all of my stuff has been . . . disappeared." *Id.* at 59 (omissions in original).

c

The UDS investigation ultimately revealed that Mr. Fairbanks did not use the Holloways' or Ms. Dustin's money to invest in a business that would generate a return, take any measures to ensure that investors could recoup their deposits, or back any investments with collateral. For example, Mr. Fairbanks told investigators that he used the Holloways' money to write an amicus brief in a criminal case, yet (1) Mr. Fairbanks is not an attorney, and (2) such an endeavor would not generate a return on investment.

Mr. Fairbanks also appropriated Ms. Dustin's investments for his own personal use. He used Ms. Dustin's initial $40,000 investment to "salvage" one of his

10

businesses, GXN Smithfield. *Id.* at 61–62. This activity did not return a profit, and Mr. Fairbanks conceded in his interview that it did not otherwise return anything of value to investors. Mr. Fairbanks directed Ms. Dustin's subsequent transfers to ERA Advantage Realty, a company for which he worked as a real estate agent. These investments were not collateralized, did not purchase assets, and did not return any profit to Ms. Dustin. And to the extent any of the principal of these investments was repaid, it was transferred to a company registered to Mr. Fairbanks's wife, called Sunnybrae—not to Ms. Dustin.

Ms. Blaylock also testified that the investigation revealed that an additional $85,000 was transferred from the joint bank account to a company called Cache Valley Management, which Mr. Fairbanks controlled. Ultimately, the UDS investigation found that all of the funds in the joint account were withdrawn.

**d**

UDS investigators also interviewed Ms. Dustin before her death. Ms. Blaylock testified that Ms. Dustin stated that she had never invested with Mr. Fairbanks; instead, she told Ms. Blaylock that Mr. Fairbanks managed her finances and gave her financial advice. Ms. Dustin also told Ms. Blaylock that the $30,500 check to ERA Realty, as charged in Count 2, was not related to a SupplyLine investment. And although she remembered similar checks to ERA Realty with SupplyLine on the memo line, she said they were personal loans that could be used for business purposes. Finally, Ms. Dustin told Ms. Blaylock she was aware that the $185,000 in the joint account with Mr. Fairbanks was gone. Ms. Blaylock testified

11

that Ms. Dustin did not express any concern, dissatisfaction, or other complaint about her interactions with Mr. Fairbanks or ERA Realty.

However, Ms. Blaylock also testified that, based on the interview, she did not believe that Ms. Dustin understood her investments. For example, she explained that although Ms. Dustin stated that she was aware that the funds she deposited in the joint account were gone, she was unaware that they had been spent completely and that nothing was left.

**B**

On November 13, 2019, Mr. Fairbanks was indicted by a grand jury on two counts of securities fraud, in violation of 15 U.S.C. §§ 77q(a) and 77x.[1] Count 1 charged securities fraud with respect to the Holloways' investment in SupplyLine, and Count 2 charged the same with respect to Ms. Dustin's investment.

On August 25, 2022—the day before trial—Mr. Fairbanks moved to sever the two counts under Federal Rule of Criminal Procedure 14. He argued, *inter alia*, that joining the two counts at trial would unfairly prejudice him because the evidence in support of Counts 1 and 2 was so different that "the risk [was] high that the jury [would] convict Mr. Fairbanks on Count 1 based on . . . evidence that [is] only somewhat relevant to Count 2," and vice versa. *Id.*, Vol. II, at 128–29 (Am. Mot. to Sever, filed Aug. 25, 2022) (capitalization omitted). The district court denied the

---

[1] The indictment also charged two counts of wire fraud (Counts 3 and 4) and one count of money laundering (Count 5), but the government later dismissed those counts.

12

motion to sever.  It reasoned that the government charged the case "as one scheme or artifice to defraud" and was entitled to present evidence on that theory, and further reasoned that, even if the counts were severed, the "government would still be presenting the same evidence in both trials."  Suppl. R., Vol. II, at 26–27 (Mot. to Sever Hr'g Tr., dated Aug. 26, 2022).

After a three-day trial, Mr. Fairbanks moved under Federal Rule of Criminal Procedure 29 for a judgment of acquittal.  The district court reserved ruling until after the jury had reached its verdicts.  The district court's jury instructions included an instruction stating that "[e]ach count and the evidence pertaining to it should be considered separately."  R., Vol. II, at 263 (Jury Instructions, filed Sep. 13, 2022).  The jury found Mr. Fairbanks guilty on both counts.

After reviewing briefing, and hearing oral argument, on Mr. Fairbanks's Rule 29 motion, the district court denied the motion.  The district court concluded that "the evidence produced at trial was sufficient to support [Mr.] Fairbanks's conviction."  *Id.* at 325 (Mem. Decision and Order Den. Mot. for J. of Acquittal, filed Dec. 19, 2022).  More specifically, the district court found that the trial record contained "evidence from which the jury could have reasonably concluded that [Mr.] Fairbanks's SupplyLine business operated as a fraud or deceit under [15 U.S.C. § 77q(a)(3)]."  *Id.* at 322.  In other words, the district court found that the "jury could have reasonably concluded that [Mr.] Fairbanks operated SupplyLine as a fraudulent course of business to both directly and indirectly enrich himself at the expense of his investors."  *Id.* at 324.  Moreover, the district court found that there was sufficient

evidence for the jury to find that the $30,500 check charged in Count 2 was for the purchase of a SupplyLine security.

After his conviction, Mr. Fairbanks skipped town: He failed to report to his sentencing hearing and remained a fugitive at large for approximately eight months before his ultimate arrest.  On April 24, 2024, the district court sentenced Mr. Fairbanks to 27 months' imprisonment, three years' supervised release, and a restitution award totaling $36,000.[2]

Mr. Fairbanks timely appealed.

---

[2]    "Our review of the BOP's [(i.e., U.S. Bureau of Prisons)] online Inmate Locator indicates that an inmate matching Mr. [Fairbanks's] basic physical description (i.e., gender and race) *and* possessing the [FBI] registration number associated with Mr. [Fairbanks] in this case," and with a listing under his name, was released from BOP custody on October 6, 2025. *Jordan v. Sosa*, 654 F.3d 1012, 1022 (10th Cir. 2011).  The parties failed to notify us of this event, even though "[w]e look to the parties to inform us of such developments, and we should be assured that they will do so diligently." *Id.* at 1020 n.11.  Nevertheless, we have no reason to believe that Mr. Fairbanks's release from prison moots this appeal.  That is because his appeal challenges his convictions, not his now-expired prison term, and, as a consequence of those convictions, Mr. Fairbanks must serve a three-year term of supervised release. *See United States v. Meyers*, 200 F.3d 715, 718 (10th Cir. 2000) (discussing Supreme Court mootness precedent and noting that "the Supreme Court acknowledged . . . a presumption of sufficient collateral consequences when a defendant who has already served his sentence appeals the propriety of his initial conviction," and that "[t]he reality of these substantial disabilities [arising from a criminal conviction] eventually led the Court to simply presume that sufficient collateral consequences exist in cases where released defendants appeal their direct convictions"); *United States v. Vera-Flores*, 496 F.3d 1177, 1180 (10th Cir. 2007) ("In this circuit, under ordinary circumstances, a defendant who has served his term of imprisonment but is still serving a term of supervised release may challenge his sentence if his unexpired term of supervised release could be reduced or eliminated by a favorable appellate ruling.").  Accordingly, we proceed to resolve this appeal on the merits.

## II

On appeal, Mr. Fairbanks challenges the district court's denial of his motion to sever Counts 1 and 2 and the sufficiency of the evidence as to Count 2.  We turn first to Mr. Fairbanks's challenge to the district court's denial of his motion to sever, and then we take up his argument that the evidence was insufficient to support his conviction on Count 2.  Finding both arguments unpersuasive, we affirm the district court's judgment.

## A

Mr. Fairbanks contends that the district court abused its discretion by denying his motion to sever Counts 1 and 2.  The district court denied the motion based on its concern that, "if [the court] severed the two counts, the government would still be presenting the same evidence in both trials."  Suppl. R., Vol. II, at 27.  The government maintains that the district court did not abuse its discretion in denying Mr. Fairbanks's motion to sever: It contends that joinder was proper, and that Mr. Fairbanks was not prejudiced by the joinder because "the evidence of how [Mr.] Fairbanks operated his SupplyLine business was applicable to both counts, and evidence regarding the transactions in both counts would likely have been admissible in a separate trial of each count."  Aplee.'s Resp. Br. at 18.  Because we agree that the two counts were part and parcel of a common fraud and, consequently, that the Count 1 evidence almost certainly would have been admissible in a separate trial on Count 2, we conclude that the joinder was not prejudicial.  Therefore, the district court did not abuse its discretion by denying Mr. Fairbanks's motion to sever.

15

**1**

"We review the district court's severance denial for abuse of discretion, while recognizing the defendant's task in overturning such a decision is difficult." *United States v. Thomas*, 849 F.3d 906, 911 (10th Cir. 2017).

Joinder is appropriate where "the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). "Even when such requirements are met, however, a trial court may elect to conduct separate trials if joinder appears to prejudice the defendant." *Thomas*, 849 F.3d at 911; *see also* Fed. R. Crim. P. 14(a) ("If the joinder of offenses [] [] in an indictment[] . . . appears to prejudice a defendant or the government, the court may order separate trials of counts . . . or provide any other relief that justice requires.").

"We have long recognized that the decision 'to grant severance under Rule 14 rests within the discretion of the district court and the burden on [the] defendant to show an abuse of discretion in this context is a difficult one.'" *United States v. Olsen*, 519 F.3d 1096, 1102 (10th Cir. 2008) (alteration in original) (quoting *United States v. Johnson*, 130 F.3d 1420, 1427 (10th Cir. 1997)). And "[w]e have repeatedly held that simply because 'the government's evidence was stronger on some counts than on others does not mandate severance under Rule 14.'" *Id.* at 1103 (quoting *United States v. Wiseman*, 172 F.3d 1196, 1212 (10th Cir. 1999), *abrogated on other grounds by Rosemond v. United States*, 572 U.S. 65 (2014)); *accord United States v. Furman*, 31 F.3d 1034, 1037 (10th Cir. 1994).

16

Accordingly, "[t]o prevail on a motion to sever, a defendant must demonstrate that the joinder would cause actual prejudice to his defense that outweighs the expense and inconvenience of separate trials." *Thomas*, 849 F.3d at 911–12. Importantly, our precedent makes clear that "[i]t is not enough to show that separate trials may have afforded a better chance of acquittal. Rather, to demonstrate prejudice, a defendant must show the right to a fair trial is threatened or actually impaired." *Id.* (citation omitted); *see also Olsen*, 519 F.3d at 1103 ("To make this showing of prejudice, the defendant must demonstrate that his 'right to a fair trial is threatened or actually deprived.'" (quoting *Johnson*, 130 F.3d at 1427)); *United States v. Hutchinson*, 573 F.3d 1011, 1025 (10th Cir. 2009) ("To win such a motion in the district court, [the defendant] was obliged to show, among other things, that the denial of severance would result in 'actual prejudice' to his defense and that this prejudice would 'outweigh' the expense and inconvenience of separate trials." (citation omitted) (first quoting *United States v. Eads*, 191 F.3d 1206, 1209 (10th Cir. 1999); and then quoting *United States v. Martin*, 18 F.3d 1515, 1518 (10th Cir. 1994))).

**2**

Mr. Fairbanks argues that the district court abused its discretion in denying his motion to sever Counts 1 and 2 under Rule 14 because joinder was prejudicial.[3] We are not persuaded.

Mr. Fairbanks first contends that "[j]oinder [] compromised [his] right to have the government prove every element of every offense with which he is charged" because "[t]he government used *unrelated evidence* from Count 1 to carry its burden with regard to Count 2, obviating the burden to prove the elements of Count 2 beyond a reasonable doubt." Aplt.'s Opening Br. at 38 (emphasis added). We read this argument to challenge the district court's conclusion that Count 1 evidence would have been admissible in a severed trial on Count 2. But that argument is meritless. The Count 1 evidence would have been admissible in a severed trial on Count 2, because both counts flow from a common fraud.

More specifically, the Count 1 evidence would have been admitted as intrinsic to Count 2. As a general matter, Federal Rule of Evidence 404(b) prohibits the admission of evidence of "other crimes, wrongs or acts" to prove an individual's character or propensity. Fed. R. Evid. 404(b) (capitalization omitted). But "[b]ecause Rule 404(b) only limits evidence of 'other' crimes—those *extrinsic* to the charged crime—evidence of acts or events that are part of the crime itself, or

---

[3]    Mr. Fairbanks's briefing does not challenge the propriety of joinder under Rule 8. Accordingly, we express no opinion on that issue.

evidence essential to the context of the crime"—that is, *intrinsic* evidence—"does not fall under the other crimes limitations of Rule 404(b)." *United States v. Alfred*, 982 F.3d 1273, 1279 (10th Cir. 2020) (emphasis added) (quoting *United States v. Parker*, 553 F.3d 1309, 1314–15 (10th Cir. 2009)); *see also id.* ("Evidence is considered 'intrinsic' when it is directly connected to the factual circumstances of the crime and provides contextual or background information to the jury, and 'extrinsic' when it is extraneous and is not intimately connected or blended with the factual circumstances of the charged offense." (quoting *United States v. Kupfer*, 797 F.3d 1233, 1238 (10th Cir. 2015))). In *United States v. Thomas*, we explained that, in the severance context, "[e]vidence of uncharged acts may be admissible as *res gestae*, or intrinsic evidence inextricably connected to the charged crimes." 849 F.3d at 912.

Here, the Count 1 evidence would have been admissible in a severed trial on Count 2 as intrinsic evidence. At trial, the government argued, *inter alia*, that Mr. Fairbanks used SupplyLine as a "course of business which operates . . . as a fraud [] [] upon the purchaser," in violation of 15 U.S.C. § 77q(a)(3). The Count 1 evidence—that is, the evidence detailing the means by which Mr. Fairbanks perpetrated the SupplyLine fraud upon the Holloways—would almost certainly have been admitted as intrinsic evidence of Mr. Fairbanks's operation of the same SupplyLine fraud upon Ms. Dustin—*viz.*, in a trial of the charge in Count 2 relating to Ms. Dustin. *See* 15 U.S.C. § 77q(a)(3); *Kupfer*, 797 F.3d at 1238.

The Count 1 evidence—especially Ms. Holloway's trial testimony— established that Mr. Fairbanks marketed SupplyLine as an investment opportunity

19

through seminars and meetings in which he promised a six-percent return on investment, collateralization, and easy withdrawal of the principal. Based on those representations, the Holloways decided to execute a SupplyLine investment contract with Mr. Fairbanks and to invest $5,500 in July 2015.

Ms. Dustin made a similar investment through a SupplyLine contract approximately one-year earlier, in May 2014. The contracts signed by the Holloways and Ms. Dustin were mirror-images of one another. And Ms. Dustin's contract was one of several SupplyLine contracts that the Holloways recovered from the office in Mr. Fairbanks's former print shop in the summer of 2017. Indeed, Ms. Holloway testified that she decided to refer the SupplyLine matter to the UDS because "[i]n looking at the documents and realizing that there were other cases that were similar to ours, I considered [SupplyLine] fraudulent." *Id.* at 108. Put simply, the Holloways and Ms. Dustin were separate victims of a common fraud.

Consequently, the Count 1 evidence was intrinsic to Count 2. Ms. Holloway's testimony as to the means by which Mr. Fairbanks convinced her to invest in the SupplyLine fraud was "inextricably intertwined" with the government's theory that Mr. Fairbanks also operated SupplyLine as a fraud upon Ms. Dustin, as charged in Count 2. *See Kupfer*, 797 F.3d at 1238. Moreover, the SupplyLine contracts underlying both counts showed that the charged conduct "occurred within the same time frame" and "provided direct proof of [Mr. Fairbanks's] involvement with the charged crimes." *Id.* Accordingly, the Count 1 evidence was "directly connected to the factual circumstances of the crime" charged in Count 2. *Id.* (quoting *Parker*,

20

553 F.3d at 1314); *see also United States v. Tucker*, 502 F. App'x 720, 724 (10th Cir. 2012) (finding no prejudice from joinder where evidence of one count was "part and parcel of the government's proof" of other counts).[4] Where, as here, the evidence as to one count would have been admissible as intrinsic evidence as to another count in a severed trial, the defendant is not prejudiced by joinder.[5] *See Thomas*, 849 F.3d at 912.

Moreover, we agree with the government that the district court's jury instructions further undermine Mr. Fairbanks's claim of prejudice. "Rule 14 . . . leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro v. United States*, 506 U.S. 534, 538 (1993). Here, the district court instructed the jury that "[e]ach count and the evidence pertaining to it should be considered separately." R., Vol. II, at 263. And such "limiting instructions are

---

[4] "We deem the reasoning of the unpublished decisions cited herein to be persuasive and instructive. We do not accord them controlling weight and recognize that they are not binding on us." *United States v. Ellis*, 23 F.4th 1228, 1238 n.6 (10th Cir. 2022).

[5] Even if the Count 1 evidence were considered other-crimes evidence for purposes of Rule 404(b), it would almost certainly have been admissible for some non-propensity purpose under Rule 404(b)(2). *See* Fed. R. Evid. 404(b)(2) ("[Evidence of other crimes] may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."). For example, Ms. Holloway's testimony was probative of Mr. Fairbanks's intent to defraud Ms. Dustin, his plan to do so through SupplyLine, and his lack of mistake. *See United States v. Hollis*, 971 F.2d 1441, 1457 (10th Cir. 1992) (affirming denial of motion for severance where, "had separate trials been granted, the evidence of similar conduct would likely have been admissible anyway under Fed. R. Evid. 404(b), as showing intent or lack of mistake, etc."); *accord United States v. Janus Indus.*, 48 F.3d 1548, 1557 (10th Cir. 1995).

'ordinarily sufficient to cure potential prejudice.'" *Thomas*, 849 F.3d at 912 (quoting *Hutchinson*, 573 F.3d at 1026). Therefore, we conclude that the district court's limiting instruction provided further prophylactic insulation against any prejudice which could occur from joining Counts 1 and 2.[6]

Mr. Fairbanks nevertheless asserts that the extreme disparity between the strength of the evidence presented on Counts 1 and 2 shows that joinder was prejudicial. Specifically, he contends that our decision in "*Wiseman* allows for the possibility that a sufficiently great disparity in the strength of the evidence on different counts is enough to mandate severance," and that such precedent "permits reliance on the *extreme disparity* present here" to show prejudice. Aplt.'s Opening Br. at 40 (emphasis added) (citing *Wiseman*, 172 F.3d at 1212). Even if we accept for the sake of argument Mr. Fairbanks's characterization of *Wiseman*, that case lends Mr. Fairbanks no succor because there is no such extreme difference in the magnitude of the evidence supporting Counts 1 and 2. Notably, as we discuss in Section II.B, *infra*, we reject Mr. Fairbanks's contention that the evidence was insufficient to convict on Count 2. *See Wiseman*, 172 F.3d at 1211–12 (rejecting defendant's severance argument based on large disparity between counts upon which "the government's evidence was strongest" and other charged counts where "there

---

[6]    We emphasize that, on appeal, Mr. Fairbanks has not meaningfully identified any evidence as to Count 1 that should have been held *in*admissible as to Count 2—nor did he raise any such objection at trial. Nonetheless, the district court's instruction reinforces our determination that joinder was not prejudicial.

was sufficient evidence to . . . support the convictions on *all* counts" (emphasis added)).  Accordingly, Mr. Fairbanks's attempt to "single[] out" Count 2 is unpersuasive. *Id.* at 1211.

And even assuming that Ms. Holloway's testimony rendered the evidence stronger on Count 1 than Count 2, "simply because 'the government's evidence was stronger on some counts than on others does not mandate severance under Rule 14.'" *Olsen*, 519 F.3d at 1103 (quoting *Wiseman*, 172 F.3d at 1212).  "It is not enough to show that separate trials may have afforded a better chance of acquittal." *Thomas*, 849 F.3d at 912.[7]  In sum, Mr. Fairbanks's "extreme disparity" argument is unpersuasive, and we reject it.

* * *

Mr. Fairbanks fails to make a persuasive showing that joinder was prejudicial. "[T]he burden on [the] defendant to show an abuse of discretion in this context is a difficult one.'" *Olsen*, 519 F.3d at 1102 (second alteration in original) (quoting *Johnson*, 130 F.3d at 1427).  Mr. Fairbanks has not satisfied his burden here. Accordingly, we conclude that the district court did not abuse its discretion by denying Mr. Fairbanks's motion to sever.

---

[7]    Relatedly, we have rejected the notion that different forms of evidence—here, victim testimony for Count 1, and law enforcement testimony and documentary evidence for Count 2—warrants severance.  *See Thomas*, 849 F.3d at 912 ("[Defendant] cites no authority to support his contention that the different forms of evidence for different counts (e.g., palm-print evidence for Count 1 versus eyewitness testimony for the remaining counts) warrants severance.").

**B**

Mr. Fairbanks also asserts that there was insufficient evidence to convict him for the securities fraud alleged in Count 2, which related to Ms. Dustin. However, based on our review of the record as a whole, we conclude that there was sufficient—indeed, ample—evidence for a rational jury to find that Mr. Fairbanks operated the SupplyLine fraud against Ms. Dustin. Notably, in assessing the fraudulent nature of the SupplyLine vehicle, the jury would have had before it, not only the evidence discretely related to Mr. Fairbanks's contractual arrangement and monetary transactions with Ms. Dustin, but also the evidence regarding Mr. Fairbanks's use of the SupplyLine vehicle in taking money from the Holloways. And at trial, Mr. Fairbanks did not assert that evidence directly related to the Holloway transaction could not also be considered by the jury in determining whether Mr. Fairbanks used the SupplyLine vehicle to defraud Ms. Dustin. Accordingly, viewing the record as a whole, we conclude that Mr. Fairbanks's sufficiency-of-the-evidence challenge is without merit and reject it.

**1**

**a**

"We review de novo whether the government presented sufficient evidence to support a conviction." *United States v. Flechs*, 98 F.4th 1235, 1242–43 (10th Cir.) (quoting *United States v. Sells*, 477 F.3d 1226, 1235 (10th Cir. 2007)), *cert. denied*, 145 S. Ct. 310 (2024) (mem.). Our task is to "determine whether, viewing the evidence in the light most favorable to the government, any rational trier of fact

could have found the defendant guilty of the crime beyond a reasonable doubt."
*United States v. Stepp*, 89 F.4th 826, 831–32 (10th Cir. 2023) (quoting *United States
v. Gordon*, 710 F.3d 1124, 1141 (10th Cir. 2013)); *accord United States v.
Goldesberry*, 128 F.4th 1183, 1191 (10th Cir. 2025).

As such, "our review is limited and deferential." *Stepp*, 89 F.4th at 832.
"[W]e consider all of the evidence, direct and circumstantial, along with reasonable
inferences, but we do not weigh the evidence or consider the relative credibility of
witnesses." *United States v. Griffith*, 928 F.3d 855, 868–69 (10th Cir. 2019) (quoting
*United States v. Pickel*, 863 F.3d 1240, 1251 (10th Cir. 2017)). And "[r]ather than
examining the evidence in bits and pieces, we evaluate the sufficiency of the
evidence by considering the collective inferences to be drawn from the evidence as a
whole." *Flechs*, 98 F.4th at 1247–48 (quoting *United States v. Brooks*, 438 F.3d
1231, 1236 (10th Cir. 2006)).

Ultimately, "we may reverse only if no rational trier of fact could have found
the essential elements of the crime beyond a reasonable doubt." *Stepp*, 89 F.4th
at 832 (quoting *Griffith*, 928 F.3d at 869). "While the evidence supporting the
conviction must be substantial and do more than raise a mere suspicion of guilt, it
need not conclusively exclude every other reasonable hypothesis and it need not
negate all possibilities except guilt." *Flechs*, 98 F.4th at 1243 (quoting *United States
v. Erickson*, 561 F.3d 1150, 1158–59 (10th Cir. 2009)).

**b**

Recall that Count 2 of the indictment charged Mr. Fairbanks with fraudulently using a means of interstate commerce in connection with the sale of a security in violation of 15 U.S.C. §§ 77q(a) and 77x.[8]  R., Vol. I, at 28–37.  To convict Mr. Fairbanks on Count 2, the jury had to find: (1) fraud by any of the three means identified in § 77q(a)(1)–(3); (2) using any means or instruments of interstate commerce or the mails; (3) occurring in the offer or sale of a security.  15 U.S.C. § 77q(a).  The three means of fraud identified in § 77q(a) are:

> (1) [] employ[ing] any device, scheme, or artifice to defraud, or
>
> (2) [] obtain[ing] money or property by means of any untrue statement of a material fact or any omission [] stat[ing] a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>
> (3) [] engag[ing] in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

*Id.*[9]  "These provisions capture a wide range of conduct."  *Lorenzo v. Sec. & Exch. Comm'n*, 587 U.S. 71, 79 (2019) (describing, *inter alia*, 15 U.S.C. § 77q(a)).

**2**

The parties agree that Mr. Fairbanks's sufficiency challenge concerns only the fraud element of 15 U.S.C. § 77q(a).  The government maintains that the jury could

---

[8]      Section 77x establishes a five-year statutory maximum term of imprisonment for violation of § 77q(a).

[9]      15 U.S.C. § 77q(a) codifies section 17(a) of the Securities Act of 1933.  *United States v. Dioguardi*, 492 F.2d 70, 72 n.2 (2d Cir. 1974).

rationally have concluded that the investment contracts at issue were securities based on their terms, and Mr. Fairbanks does not disagree.  Nor does Mr. Fairbanks challenge the interstate commerce element—presumably because the parties stipulated that processing the $30,500 cashiers' check identified in Count 2 involved the use of an instrumentality of interstate commerce.  Thus, the only question presented by Mr. Fairbanks's sufficiency challenge is whether the evidence was sufficient to establish fraud by one of the three means enumerated in § 77q(a).

The district court found that "[the] evidence supports a finding that [Mr.] Fairbanks's SupplyLine business scheme constituted a 'course of business which operates . . . as a fraud or deceit upon the purchaser.'"  R., Vol. II, at 323 (quoting 15 U.S.C. § 77q(a)(3)).  We agree.

**a**

The evidence was sufficient to show that Mr. Fairbanks operated the SupplyLine investment vehicle as a fraud or deceit on a purchaser—specifically, Ms. Dustin.  *See* 15 U.S.C. § 77q(a)(3); *Stepp*, 89 F.4th at 831–32.  More specifically, a jury could rationally find that Mr. Fairbanks talked Ms. Dustin into entering a SupplyLine investment contract and investing $98,700 into SupplyLine, and that SupplyLine operated in a fraudulent and deceitful manner when Mr. Fairbanks used Ms. Dustin's investment funds for his own purposes.

That SupplyLine reflected a fraudulent or deceitful course of dealing is particularly underscored by looking not only at the evidence relating to Ms. Dustin but also the evidence related to the Holloways, who were also victims of

27

Mr. Fairbanks and SupplyLine. Mr. Fairbanks used distinct means to recruit Ms. Dustin and the Holloways to invest in SupplyLine, but as to both victims SupplyLine was a business that operated as a fraud or deceit on the purchaser. That is, Mr. Fairbanks's approach to each victim was part and parcel of a unified fraud, predicated on investments in SupplyLine.

Compared to Ms. Dustin, the Holloways were more discerning investors. Accordingly, Mr. Fairbanks solicited the Holloways' investment through a professionalized approach. He marketed SupplyLine through seminars, marketing materials, and one-on-one meetings. Yet, the outcome of Mr. Fairbanks's fraudulent or deceitful use of the SupplyLine vehicle was similar to the outcome with Ms. Dustin: He got the Holloways to enter into an investment contract; took their money (i.e., a $5,500 deposit), and used their funds for personal purposes, not designed to generate SupplyLine-related profits (i.e., to write an amicus brief); and then refused to repay the principal or the guaranteed six-percent return; and disappeared when the Holloways sought the return of their investment.

Concerning Ms. Dustin, as her health declined, she became increasingly vulnerable and isolated. And, compared to the Holloways, Ms. Dustin was more trusting of Mr. Fairbanks; yet, both were deceived by the operation of SupplyLine. Mr. Fairbanks leveraged Ms. Dustin's trust to solicit sizable investments into SupplyLine throughout the final years of her life. Moreover, as he would later do with the Holloways, Mr. Fairbanks got Ms. Dustin to enter into an investment contract; took her money and used it for personal purposes that were not aimed at

28

generating SupplyLine-related profits; and never repaid the principal or the guaranteed six-percent return.

To recap some of the details, the record shows that at some point before her first stroke, Ms. Dustin signed a contract with Mr. Fairbanks to invest in SupplyLine. The contract guaranteed, among other things, a six-percent annual return on her investment. And the contract's "capital contribution schedule" listed an initial investment of $40,000, dated May 29, 2014, which the UDS investigator, Ms. Blaylock, testified was paid in cash to Mr. Fairbanks. The contract also contemplated additional investments.

On December 10, 2015, while Ms. Dustin was recovering from a stroke, she opened a joint checking and savings account with Mr. Fairbanks. Mr. Fairbanks deposited $100 into the joint account, and Ms. Dustin deposited $185,000. A total of six cashiers' checks were drawn on this account from 2015 to 2017 with "SupplyLine Partners" written in the memo line. The checks were made out to ERA Advantage Realty, where Mr. Fairbanks worked as a real estate agent. A total of $58,700 was transferred from the joint account to ERA Advantage Realty.

Notably, the jury could have reasonably found from the evidence of the $40,000 initial cash investment, the opening of the joint bank account, and the subsequent issuance of the cashiers' checks that Mr. Fairbanks operated SupplyLine as a fraud on Ms. Dustin and, from that fraud, secured a total investment of $98,700.

Mr. Fairbanks used Ms. Dustin's initial $40,000 investment to salvage one of his businesses. Suffice it to say that this action did not return a profit or recoup the

principal of Ms. Dustin's investment or otherwise yield anything of value to pay Ms. Dustin for her investment. And the subsequent SupplyLine investments in ERA Advantage Realty were not used to purchase assets and did not return any profit to Ms. Dustin. Underscoring the fraudulent operation of SupplyLine, Ms. Blaylock testified that UDS's investigation revealed that SupplyLine was neither registered to do business in Utah, nor authorized to deal in securities.

And if that were not enough, Ms. Dustin's niece, Ms. Elam, testified that she became concerned about Mr. Fairbanks's relationship with Ms. Dustin during this time. During the period after Ms. Dustin's first stroke until her death, in Ms. Elam's telling, her "whole family became quietly alienated away from her [(i.e., Ms. Dustin)]." Suppl. R., Vol. I, at 169. Meanwhile, Ms. Elam observed that Mr. Fairbanks started coming around Ms. Dustin's house each day in the month before her first stroke and continued to visit her afterwards as her condition diminished. Ms. Elam's concerns grew so great that she filed a complaint with Adult Protective Services regarding Ms. Dustin's dealings with Mr. Fairbanks, and took steps to protect her own mother from financial exploitation. A rational jury could infer from Ms. Elam's testimony that Mr. Fairbanks's extensive interactions with Ms. Dustin were aimed at winning her trust so that he could obtain her funds through fraud or deceit—ostensibly as investments in SupplyLine. And the jury would have heard evidence that he succeeded in getting those funds.

To be sure, Ms. Blaylock testified that, in her UDS interview, Ms. Dustin indicated that she did not believe that Mr. Fairbanks was defrauding her. However, a

rational jury could have found that Ms. Blaylock's further testimony put Ms. Dustin's belief in context and undercut its exculpatory value for Mr. Fairbanks. Specifically, Ms. Blaylock testified, based on her observations in the interview with Ms. Dustin, that she did not believe that Ms. Dustin understood her investments. Accordingly, a rational jury could have found that Ms. Dustin would not have known whether Mr. Fairbanks was defrauding her.

Mr. Fairbanks's statements to UDS investigators provided further evidence of fraud. Mr. Fairbanks told investigators that SupplyLine documents had been "destroyed," *id.* at 209–10, and offered shifting explanations of whether SupplyLine offered a security, solicited investments, and even had an operational status in the first place. And when faced with contrary evidence, including his investment contract with Ms. Dustin, Mr. Fairbanks stated that "all of the investments have been sabotaged," *id.*, Vol. IV, at 58, and that he could not provide an accounting of Ms. Dustin's investments because "I'm homeless, all of my records . . . all of my computers . . . all of my stuff has been . . . disappeared," *id.* at 59 (omissions in original).

In summary, the jury could have reasonably concluded from the "collective inferences to be drawn from the evidence as a whole," *Flechs*, 98 F.4th at 1247–48 (quoting *Brooks*, 438 F.3d at 1236), that Mr. Fairbanks operated SupplyLine as a "course of business which operate[d] . . . as a fraud [] [] upon" Ms. Dustin, 15 U.S.C. § 77q(a)(3); *accord Stepp*, 89 F.4th at 831–32; *Griffith*, 928 F.3d at 868–69. Indeed, there was ample evidence before the jury to this effect.

31

**b**

Mr. Fairbanks's counterarguments are unpersuasive.  He contends that the evidence was insufficient because "[t]he district court erred in using evidence of fraud in Count 1 [(involving the Holloways)] to establish fraud in Count 2 [(involving Ms. Dustin)]."  Aplt.'s Opening Br. at 23 (italicization omitted).  Mr. Fairbanks argues that the evidence of fraud in Count 1 was not probative of fraud in Count 2 because "Mr. Fairbanks spent Ms. Dustin's money in the way their agreement contemplated," *id.* (underlining omitted), and, whereas "Ms. Holloway complained of fraud[,] [] Ms. Dustin denied the existence of fraud," *id.* at 28 (underlining omitted).  We are not persuaded by these arguments.

First, and most fundamentally, Mr. Fairbanks fails to show why the government could not permissibly use the Count 1 evidence in support of its prosecution as to Count 2.  At trial, Mr. Fairbanks did not assert that evidence directly related to the Holloway transaction could not also be considered by the jury in determining whether Mr. Fairbanks used the SupplyLine vehicle to defraud Ms. Dustin.  And we have rejected Mr. Fairbanks contention in Section II.A, *supra*, that the trial of Counts 1 and 2 should have been severed.  The jury was thus entitled to consider the evidence of both counts as part and parcel of the same unified SupplyLine fraud.

Second, a rational jury could have found that the record evidence belied Mr. Fairbanks's assertion that he "spent Ms. Dustin's money in the way their agreement contemplated."  Aplt.'s Opening Br. at 23 (underlining omitted).  Indeed,

32

the record contains ample evidence to show that Mr. Fairbanks spent Ms. Dustin's money for his own purposes, and when given an opportunity to provide an accounting of how Ms. Dustin's assets were spent, he declined, stating only that his SupplyLine records had been "destroyed" and "disappeared." Suppl. R., Vol. I, at 209–10; *accord* R., Vol. IV, at 59. Where, as here, the evidence supporting the jury's finding of guilt is substantial and raises more than a *mere suspicion* of guilt, "the evidence supporting the conviction . . . need not conclusively . . . negate all possibilities except guilt." *Flechs*, 98 F.4th at 1243 (quoting *Erickson*, 561 F.3d at 1158–59). Even assuming some evidence supports Mr. Fairbanks's alternate theory that his expenditure of Ms. Dustin's funds was authorized, a rational jury was not obliged to adopt that theory and, indeed, there was considerable evidence that would have counseled against it doing so.

And third, Mr. Fairbanks suggests that the district court erred in rejecting his sufficiency-of-the-evidence challenge because it "disregarded . . . th[e] distinction" between Ms. Holloway's testimony regarding Mr. Fairbanks's fraudulent conduct and the reported belief of Ms. Dustin that Mr. Fairbanks did not defraud her. Aplt.'s Opening Br. at 29. However, Mr. Fairbanks has not identified any categorical bar on the district court's consideration of Ms. Holloway's testimony in addressing the sufficiency of the evidence as to Count 2 based on the distinction Mr. Fairbanks has drawn, and there is not one. *See Griffith*, 928 F.3d at 868–69 (noting that, in considering the sufficiency of the evidence, courts "consider all of the evidence,

33

direct and circumstantial, along with reasonable inferences" (quoting *Pickel*, 863 F.3d at 1251).

Furthermore, it was within the jury's purview to weigh the testimony of Ms. Holloway regarding Mr. Fairbanks's fraudulent conduct and the reported belief of Ms. Dustin that Mr. Fairbanks did not defraud her against Ms. Blaylock's testimony that Ms. Dustin did not understand her investments. And having done so, it found Mr. Fairbanks guilty beyond a reasonable doubt. We have made clear that, in judging the sufficiency of the evidence, "'[w]e will not weigh conflicting evidence or second-guess the fact-finding decisions of the jury,' and we defer to the jury's assessment of a witness's credibility." *Flechs*, 98 F.4th at 1243 (quoting *Sells*, 477 F.3d at 1235). Accordingly, the district court committed no error in its approach and ruling.

Mr. Fairbanks's final argument is that the district court erred by "assuming a failed investment is the same as a fraud." Aplt.'s Opening Br. at 30 (italicization omitted). This argument is meritless. The evidence is more than sufficient to show that SupplyLine was not merely a "failed investment" but rather a fraudulent vehicle that Mr. Fairbanks operated to bilk his investors.

In summary, Mr. Fairbanks's arguments do not disturb our conclusion that the government presented sufficient evidence to support a conviction on Count 2. *See Flechs*, 98 F.4th at 1242–43. "[O]ur review is limited and deferential; 'we may reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Stepp*, 89 F.4th at 832 (quoting *Griffith*,

928 F.3d at 869). Given that substantial evidence supports the theory that Mr. Fairbanks operated SupplyLine as a fraud upon Ms. Dustin, it is beyond cavil that there is no basis to reverse the district court's sufficiency-of-the-evidence ruling.

* * *

Accordingly, we conclude that the evidence was sufficient to support Mr. Fairbanks's conviction on Count 2.

## III

For the foregoing reasons, we **AFFIRM** the district court's judgment, upholding the district court's denials of Mr. Fairbanks's motions for severance and judgment of acquittal on Count 2.

Entered for the Court

Jerome A. Holmes
Chief Judge

35